T.D. "Johnny" Johnston began working as a sales manager for Green Mountain, Inc., in *Page 1118 
April 1988. Johnston's employment contract provided that he was to receive a salary of $50,000 his first year with Green Mountain and, thereafter, an annual base salary of $40,000 and "commissions equal to one-half percent (1/2) of the amounts actually received by the Employer during the applicable year from gross sales for such year in excess of ($2,000,000.00) ('Commissions')." Johnston also signed deferred compensation and trust agreements providing that no amount would be payable if Johnston voluntarily terminated his employment prior to the expiration of the initial five-year term of employment.
Keith Schonrock and his wife joined with Gerry Donovan and his wife in 1986 to form Green Mountain, a franchise of Uniglobe Travel (hereinafter "Uniglobe"); together, the Schonrocks own 98%, and the Donovans own 2%, of the stock in Green Mountain. The company makes airline, hotel, and car rental reservations and provides related travel services for corporate and individual customers and derives nearly all of its income from sales commissions paid by airlines, hotels, and other providers of travel services. Green Mountain acquired the assets of Madison Travel (hereinafter "Madison") in May 1989. Schonrock had joined with four other persons in 1969 to form a company called M S Computing, which later became Intergraph Corporation, and, on April 30, 1990, that company and Green Mountain signed a contract whereby Green Mountain agreed to pay to Intergraph all sales commissions and related revenues generated by Intergraph commercial travel in exchange for exclusive on-premises access by Green Mountain to Intergraph employees in order to solicit leisure travel business. Intergraph also agreed to pay Green Mountain a nominal fee for recordkeeping. Green Mountain entered into a consulting contract with Intergraph on January 17, 1990, under which Schonrock served as an independent contractor to Intergraph on matters unrelated to the travel business. The consulting fees pursuant to this agreement were $5,000 a month and were paid directly to Green Mountain. Schonrock was not personally compensated for his services.
In June 1990, Green Mountain received two awards from Uniglobe for outstanding sales. According to Schonrock and Donovan, sales for periods since the Madison acquisition are as follows:
 April 26, 1989, to April 25, 1990: Green Mountain, Inc. $ 1,413,944.66 Madison Travel $ 810,494.38 Intergraph Corporation $ 7,411,278.59
 April 26, 1990, to April 25, 1991: Green Mountain, Inc. $ 1,343,119.79 Madison Travel $ 1,162,356.75 Intergraph Corporation $ 14,710,388.60
 April 26, 1991, to July 21, 1992:[1]
Green Mountain, Inc. $ 2,794,286.01 Intergraph Corporation $ 17,618,241.15
Johnston approached Donovan in July 1990 to discuss his commissions and was told that, under the applicable provision of his contract, the Intergraph and Madison sales would be excluded in calculating his commission. At issue was the "amounts actually received" portion of the provision. During a February 11, 1991, meeting with Johnston, Donovan presented Johnston with a "talking paper" concerning his compensation, which read, in part:
 "1. Additional compensation provision of employment agreement is intended as incentive to reward your success in increasing Green Mountain, Inc.'s, sales. *Page 1119 
While it is not intended to 'nit-pik' as to which new sales are the result of your efforts or the efforts of others over whom you have no control, two events of 1989 clearly fall outside the intent of the additional compensation provision: (a) the purchase of new business through the Madison Travel agency acquisition and (b) the Intergraph STP [satellite ticket printer] arrangement. Madison Travel purchase brought in a sales base of $1,000,000 annually; the Intergraph deal was struck between Keith Schonrock and Jim Meadlock.
 "Bottom line: for purposes of computing incentive compensation, annual sales will be reduced by (1) $1,000,000 (Madison base); and (2) all sales attributed to the Intergraph deal."
Throughout the month of February, discussions between Johnston and Donovan and Schonrock became deadlocked and, on March 7, 1991, Johnston resigned from his employment with Green Mountain.
In his complaint, as amended, against Schonrock, Donovan, and Green Mountain, Johnston alleged breach of contract (Count I) and fraud (Count II) and sought to have Green Mountain's corporate identity disregarded and to impose personal liability on Schonrock and Donovan (Count III). The trial court dismissed Count I as to Schonrock and Donovan individually. It entered a summary judgment for all of the defendants on Counts II and III and on that portion of Count I which sought commissions and salary that allegedly accrued following Johnston's resignation. Finally, the trial court denied that portion of the defendants' motion for summary judgment pertaining to Johnston's claim for deferred compensation as well as Johnston's motion for partial summary judgment on Counts I and III. Thus, Johnston's claim in Count I that Green Mountain breached its employment agreement with him by failing to pay his commissions is still pending in the trial court.[2] Johnston appeals from the summary judgment made final pursuant to Rule 54(b), A.R.Civ.P.
 I
Johnston's alter ego argument is twofold. He contends that Schonrock and Donovan had him assume "numerous duties and responsibilities" that were unrelated to Green Mountain and for which his sole compensation was his salary from Green Mountain. Specifically, Johnston claims that his involvement in two organizations — Executive Connection and Friends of Recreational Ice Activities ("FRIA") — precluded him from soliciting business for Green Mountain and, thereby, increasing his commissions. He also claims that Schonrock's "symbiotic" relationship with Intergraph prompted Intergraph to enter into the exclusive sales agreement with Green Mountain, the revenues from which were not included in calculating his commissions.
Executive Connection was formed in 1987 to handle travel services that were outside the scope of the normal commercial travel arrangements handled by Uniglobe, particularly aircraft and limousine charters. It was originally owned by the Schonrocks and another couple, Alan and Inez Wilson, but the Donovans later bought the Wilsons' interest. Executive Connection's board of directors named Johnston vice president of the company in June 1988. Schonrock testified at his deposition regarding Johnston's involvement with Executive Connection as follows:
 "Gerry Donovan and I, along with our wives, wanted to determine whether or not the services provided by Executive Connection, since we no longer had an active operational manager for Executive Connection, could be or should be profitably and meaningfully absorbed by Green Mountain, under the Green Mountain umbrella, even though Executive Connection was a completely separate corporation with *Page 1120 
completely separate bank accounts at that time. We asked Mr. Johnston to do a couple of things: One, to perform a marketing study to determine for us whether it made sense for Green Mountain to be able to use Executive Connection's services as a marketing tool to enhance the sale of Uniglobe services; and, secondly, in the event that we decided to continue with Executive Connection as part of Green Mountain, we did a tentative agreement with Mr. Johnston that if we concluded that such a business arrangement was meaningful, we would then proceed with it such that he could get compensated for his involvement with Executive Connection."
FRIA is a volunteer organization in which Schonrock and the Donovans were involved. After Johnston began working for Green Mountain, Schonrock asked Johnston if he would chair a committee to raise money for FRIA, and Johnston agreed. During Johnston's involvement with FRIA — which lasted until he left Green Mountain — the organization raised approximately $1,500,000.
The defendants contend that Johnston has failed to show that he was harmed by their allegedly improper actions. In order to pierce Green Mountain's corporate veil, Johnston must show not only that the dominant party has complete control and domination of the subservient corporation's finances, policy, and business practices but also that it misused that control to Johnston's detriment. First Health, Inc. v. Blanton,585 So.2d 1331 (Ala. 1991). "Mere domination or control of a corporation by its stockholder cannot be enough to allow a piercing of the corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it." Id. at 1335 (citations omitted).
Although Schonrock and his wife are the majority shareholders of Green Mountain, there is no evidence that either one of them controlled Green Mountain to the extent that it had no separate mind, will, or existence of its own.[3] See First Health, 585 So.2d at 1334. Assuming for the sake of argument that Schonrock exercised excessive control of Green Mountain, his dealings with Intergraph did not amount to misuse of that control nor did they proximately cause Johnston's alleged harm. Green Mountain's contract with Intergraph was a mutually beneficial arrangement that, if anything, maintained Green Mountain's corporate integrity. Green Mountain received the exclusive, on-site privilege of soliciting Intergraph employees' personal travel business in exchange for the sales commissions and related revenue on Intergraph's commercial travel. Although the financial wisdom of this arrangement is questionable, it does not evidence misuse of control.
Similarly, Johnston has not demonstrated that he was harmed by his involvement with Executive Connection and FRIA.[4] His argument is, essentially, that the time he spent with those organizations prevented him from soliciting business for Green Mountain. If anything, Johnston's civic activities could have generated potential business for Green Mountain and, ultimately, commissions for himself. Schonrock characterized the benefits of Green Mountain's involvement with FRIA as "enormous community publicity, good spirit, and recognition for our work in a municipally sanctioned project." Indeed, Johnston acknowledged in his deposition that there were business advantages to his involvement with FRIA:
 "Q. What else do you claim Mr. Schonrock demanded you do that didn't relate to the business of Green Mountain? Let me back up just a minute. Before I leave that subject, Green Mountain has been able to generate business or some business through the association of you and other persons at Green Mountain with FRIA, isn't that right? *Page 1121 
 "A. I suspect there's been some business there. I wouldn't know how to identify it, but I suspect there has been.
 "Q. You would agree with me, wouldn't you, that taking on a project like FRIA is good public relations for Green Mountain or can be?
"A. I suppose it could be, yes.
 "Q. And it could be a source of business, could it not?
 "A. Well, I think any exposure is a good source of business.
"Q. And FRIA was that, wasn't it?
"A. There was some exposure to FRIA, yes."
There is simply no evidence that Johnston's involvement with Executive Connection and FRIA was involuntary or that it was a condition of his employment. Thus, the summary judgment with regard to Count III is due to be affirmed.
 II
Johnston contends that Green Mountain's refusal to include the revenues from the Madison and Intergraph sales amounted to an anticipatory breach of his employment contract and entitled him to post-resignation salary and commissions. As noted earlier, the breach of contract issue is still pending in the trial court. However, even if the jury were to find that Green Mountain breached the commissions provision of Johnston's employment contract, he would not necessarily be entitled to post-resignation salary and commissions. In order for there to be an anticipatory breach, or repudiation, of a contract, the breach must be substantial:
 "[T]he evidence must show words or acts evincing an intention to refuse performance within the future time allowed by the contract.
 ". . . 'Merely because a given act or course of conduct of one party to a contract is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be longer bound by it.' "
Draughon's Business College v. Battles, 35 Ala. App. 587, 590,50 So.2d 788, 790 (1951). See, also, Shirley v. Lin,548 So.2d 1329, 1334 (Ala. 1989).
Green Mountain's refusal to include the Madison and Intergraph sales did not evidence that Green Mountain intended not to be bound by Johnston's contract. Rather, it amounted to a conflicting interpretation of the commission provision. " 'Mere refusal, upon mistake or misunderstanding as to matters of fact or upon an erroneous construction of [a contract provision] . . . is sufficient to constitute a breach of that provision, but it does not amount to a renunciation or repudiation of the policy.' " Box v. Metropolitan Life Ins.Co., 232 Ala. 447, 449, 168 So. 220, 222 (1936) (emphasis added) (citation omitted). Thus, the summary judgment with regard to the anticipatory breach aspect of Count I is also due to be affirmed.
 III
Johnston alleges both promissory fraud and suppression of a material fact in Count II of his complaint. He contends that the defendants induced him to leave his position with Eastern Airlines based on a compensation and commission plan that they did not intend to follow. He also contends that they withheld the amounts that Green Mountain actually received from its sales with an intent to deceive him regarding his compensation.
Proof of the following elements is necessary to sustain an action for promissory fraud: (1) a misrepresentation, (2) of a material existing fact, (3) upon which the plaintiff justifiably relied, (4) which proximately caused injury or damage to the plaintiff. Vance v. Huff, 568 So.2d 745, 750
(Ala. 1990). In addition, the plaintiff must show that, at the time of the alleged misrepresentation, the defendant intended not to do the acts promised and intended, instead, to deceive the plaintiff. Vance v. Huff, supra. See, also, Campisi v.Scoles Cadillac, Inc., 611 So.2d 296 (Ala. 1992).
Johnston's promissory fraud claim fails, because the actions complained of — the Madison acquisition and the Intergraph contract (these are the only sales that Johnston alleges were wrongfully excluded in calculating his commissions) — were not existing facts when Johnston's contract was executed. There is also no evidence that the defendants *Page 1122 
intended not to perform in accord with the commissions provision, because the Madison and Intergraph deals were not consummated until a year after Green Mountain had employed Johnston. Green Mountain did not acquire the assets of Madison until May 1989 — over one year after Johnston was hired — and, according to Donovan's deposition testimony, Green Mountain had no business relationship with Intergraph until after September 1, 1989, the target date for the Intergraph/Green Mountain transition.
Johnston's suppression claim also fails. Throughout his deposition, Johnston acknowledged that he was apprised of the Madison and Intergraph negotiations and was provided with revenue figures when he asked for them:
 "Q. So it's accurate, then, that whenever you asked for information about the Intergraph arrangement, you got what you asked for?
"A. I believe that's correct, yes.
". . . .
 "Q. . . . [T]he question that I'm asking you, and I want to make sure that I understand that there was never a time at which you requested any information concerning the Intergraph arrangement or the Madison acquisition where somebody said, 'We're not going to give you that information,' or words to that effect?
 "A. I can't recall any incidents of that nature right at the moment, no."
The summary judgment with regard to Johnston's fraud and suppression claims contained in Count II is, therefore, also due to affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, HOUSTON, KENNEDY and INGRAM, JJ., concur.
[1] This is the date of the answer to the interrogatory calling for this information.
[2] In concluding that Johnston's motion for partial summary judgment with regard to Count I was due to be denied, the trial court reasoned that the commissions provision of Johnston's employment contract is ambiguous and that a jury should decide the issue of its proper construction. Johnston contends that the provision mandates that his commission be based on gross sales, and the defendants contend that it is based on amounts actually received by Green Mountain from gross sales.
[3] In light of his and his wife's 2% ownership interest in Green Mountain, Donovan's financial control of the corporation was limited at most.
[4] Johnston was compensated for his work with Executive Connection. In a provision similar to that in his employment contract, Johnston was to receive commissions in the amount of one half percent of the revenues received by Executive Connection.