Sandra WADE; Virginia L. Fuller; Lisa Glass; Greg Harrington; Joann Holle; Debbe Key; Marny Mott; Mike Perko; and Pam Warren, Plaintiffs,

v.

CHASE MANHATTAN MORTGAGE CORPORATION, Defendant.

No. CV96–H–41–S.

United States District Court, N.D. Alabama, Southern Division.

May 8, 1997.

Charles R. Crowder, Annesley H. DeGaris, Cory Watson Crowder & Degaris, Birmingham, AL, D. Bruce Petway, Lucas Alvis & Wash PC, Birmingham, AL, for plaintiffs.

Wayne Morse, Jr., Clark & Scott, Birmingham, AL, Gary R. Kessler, Irvin Stanford & Kessler, Atlanta, GA, for Chemical Residential Mortg. Corp., Margaretten & Co., Inc., Chemical Bank, defendants.

Wayne Morse, Jr., Clark & Scott, Birmingham, AL, Gary R. Kessler, Irvin Stanford & Kessler, Ann Hale–Smith, Irvin Stanford & Kessler, Atlanta, GA, for Chase–Manhattan Mortgage Corporation, defendant.

## MEMORANDUM OF DECISION AND ORDER

HANCOCK, Senior District Judge.

The court has before it the February 21, 1997 motion by defendant for summary judgment on all of plaintiffs' claims in this action. In accordance with the court's February 24, 1997 order, this motion was deemed submitted, without oral argument, to the court for decision on March 24, 1997. Defendant filed its evidence in support of the motion and a supporting brief on February 21, 1997. Plaintiffs filed their evidence in opposition to the motion on March 17, 1997. The memorandum in opposition to defendant's motion for summary judgment was filed by plaintiffs on March 24, 1997.

Defendant filed a motion for leave to file a reply brief on April 7, 1997. Then on April 9, 1997 plaintiffs filed a motion to strike defendant's motion for leave. Plaintiffs' motion to strike is **GRANTED** as to the Affidavit of Gregg Gorman and the portion of the reply brief relying on Gorman's affidavit, contained in Section A., on page 1 and the first paragraph of page 2. Plaintiffs' motion to strike is otherwise **DENIED.** Defendant's motion for leave is **GRANTED,** except as to the materials stricken, i.e. the Gorman affidavit and Section A of the reply brief.

## I. FACTUAL BACKGROUND

In November of 1994, plaintiffs were employees of Fleet Mortgage Corporation ("Fleet") in Birmingham, Alabama. *See* Complaint ¶ 7. Plaintiff Sandra Wade served as manager of the Birmingham branch office of Fleet from November 1989 until November of 1994. *See* Wade depo. 27–29. The other plaintiffs worked for Wade at Fleet. Joann Holle, Debbe Key, Mike Perko, Greg Harrington and Virginia Fuller worked as loan officers. *See* Holle depo. 11–12; Key depo. 27–28; Perko depo. 30–31; Harrington depo. 16; Fuller depo. 9. Lisa Glass and Marny Mott served as loan processors. *See* Glass depo. 19; Mott depo. 8–9. Pam Warren was the office manager/closer. *See* Warren depo. 7–8. The plaintiffs all had experience in the mortgage industry, in varying degrees.

Early in 1995, a regional manager for Chemical Residential Mortgage Corporation ("Chemical"), Craig Londre, was contacted by a headhunter named Maureen Walker who offered the services of her company, Pacific West Search. *See* Londre depo. 7, 12, 16, 57–60, 66. Londre referred Walker to Ken Kurilec who was serving as an area manager for Chemical. *See* Kurilec depo. 17–18. Londre was Kurilec's immediate supervisor. *See* Londre depo. 16, 18. One of Kurilec's responsibilities at Chemical was to look at expansion opportunities in the Southeast. *See* Kurilec depo. 18.

Kurilec was based in Atlanta Georgia. *See* Kurilec depo. 17–18. Kurilec and Walker had several conversations and discussed Kurilec's interest as to any opportunity located in an area reasonably related to Atlanta. *Id.* at 26–27. During the week of September 12 or 19, 1994, Walker and her associate, Dave

Rauhoff, talked with plaintiff Sandra Wade by telephone. *See* Wade depo. 60–64. Rauhoff and Walker informed Wade that they were in search of a person to start and run an office for a mortgage firm who was considering coming to Birmingham and later revealed to Wade that Chemical was the firm mentioned. *See* Wade depo. 60–64, 78–79. During the first conversation, Rauhoff and Walker told Wade that she had been recommended to them. *Id.* at 60–64. Once Wade expressed interest in the position, a meeting between Wade and Kurilec was scheduled for September 26 at a Steak and Ale restaurant in Birmingham. *Id.* at 82.

Wade and Kurilec met at the Steak and Ale for around an hour and discussed Chemical, its products and benefits and Wade's record with Fleet. *See* Wade depo. 82–84; Kurilec depo. 68–71. Kurilec told Wade at that time that Chemical was considering coming to Birmingham and that she had been recommended as someone he should interview. *See* Kurilec depo. 71–72. Wade informed Kurilec that she would want to bring her Fleet staff with her, and he informed Wade that Chemical was only considering her at that time. *Id.* at 72–73. However, Wade was told that if she became the new Chemical branch manager, she would be the one making the hiring decisions for the branch office. *See* Kurilec depo. 72–73; Wade depo. 154–55.

Shortly thereafter Wade told plaintiff Joann Holle about the situation and her discussion with Kurilec. *See* Wade depo. 75, 84. During later telephone conversations, Wade provided Kurilec with information about the Fleet office's production levels and staffing. *See* Kurilec depo. 77–78. Kurilec asked if any of the loan officers would be willing to move from Fleet to Chemical, but Wade responded she did not know at that time. *See* Wade depo. at 94. At that time Wade had not talked about the move to Chemical with anyone, except Joanne Holle. *Id.* In order to gain additional information on the Birmingham market, Kurilec called requesting and later received information from the Chamber of Commerce and other local sources, including real estate agents. *Id.* at 59.

On October 11, 1994, Wade and Holle were in Atlanta attending a seminar and went to Kurilec's office to see the operation and allow Holle to meet Kurilec. *See* Wade depo. 85. Kurilec talked to Wade and Holle about Chemical's plans for a Birmingham office. *Id.* At 93. Kurilec sent Londre a memorandum on October 14, 1994, which outlined the opportunity in Birmingham and requested approval for the opening of a branch office with Wade as the manager. Londre depo. Ex. 3. In the memorandum, Kurilec stated that he had met with Wade and two of her loan officers. *See* Plaintiff's Evid. Sub., Exh. O. Kurilec acknowledged in the memorandum that "THE BRANCH IS TRYING TO MOVE AS A GROUP, WHICH INCLUDES A MANAGER, 5 LOAN OFFICERS, AND PROCESSING." *Id.* Once Londre forwarded the memorandum to his supervisor, Terry Williams, and received approval, Londre called Kurilec to communicate the approval and inform him that a business plan needed to be prepared for presentation to Chemical's executive committee who would have final decision-making authority about the branch office. *See* Londre depo. 25, 87, 110, ex. 3. Kurilec gathered information, with the help of Wade, and had a Chemical employee in the home office put together the business plan for the executive committee. *See* Londre depo. 152; Kurilec depo. 63–64; Wade depo, ex. 3. During the week of November 7, 1994, Chemical's executive committee provided final approval for the Birmingham branch office with Wade as the branch manager. *See* Wade depo. 111.

Kurilec called Wade to inform her of the approval. *Id.* Then on November 18, Kurilec came to Birmingham to meet with Wade and formally offered Wade the job as branch manager, which Wade accepted. *See* Wade depo. 114–15. Wade gave her notice to Fleet around November 21. *Id.* At 90. Kurilec gave Wade a dollar figure that provided her budget for the salaries of anyone she wanted to hire. *See* Kurilec depo. 124–126. During the next several days Wade met with the other plaintiffs, except Glass,[1] and extended job offers to them to come work with her at

---

1. Based on the deposition testimony by Glass, it is not clear as to what date she learned about any opportunity at chemical, but it is undisputed that she came to work for Chemical a month after the rest of the plaintiffs. Glass depo. at 41.

the Chemical branch office. *See* Wade depo. 154–58.

On November 18, 1994, Kurilec and Wade met with a leasing agent and looked for permanent office space for the Birmingham branch. Wade depo. 126, 129–30; Kurilec depo. at 129–32. Kurilec informed Wade that she needed to find some temporary space to begin working out of while he made arrangements for a permanent space. Wade depo. 130. Wade made arrangements to rent a temporary space in Shared Office Services ("SOS") on Lorna Road in Birmingham, until permanent space became available. Wade depo. at 131–132.

Kurilec and Marsha Marks [2] had dinner on either November 21 or 22, with Wade, Holle, Fuller, Harrington and Perko at the Connie Kanakis restaurant in Birmingham. *See* Fuller depo. 29–30; Perko depo. 50–51; Harrington depo. 38–40; Holle depo. 67–69. Kurilec discussed Chemical's products and Chemical's plans for the Birmingham branch with the above named plaintiffs present. *Id.*

Chemical's Birmingham branch office opened for business in the temporary SOS space on or about December 12, 1994. Wade depo. 141. Originally there was one office with two phone lines. Morris depo. 22, 30. Then in February, Chemical added another office with a third phone line for the computers. Morris depo. 23, 37–38, 86.

When the branch office first opened in December the resident employees were Wade, Harrington, Key, Fuller, Perko, Warren and Mott. Wade acted as the "producing" branch manager, providing some loan officer services. Harrington, Key, Fuller and Perko were serving as loan officers. Warren was the office manager/closer, and Mott was the loan processor. Holle did not come to work with Chemical as a loan officer until after December 22, 1994. Holle depo. 90–94. Glass was not offered a job by Wade at Chemical until late December or early January. Glass depo. 39, 42.

In January of 1995 a change in management occurred and Londre's supervisor changed. *See* Londre depo. 273–74. The new supervisor, Gregg Gorman, was not pleased with the Birmingham branch, and other branch offices, based on production and profitability numbers. Londre depo 276.

Computers were installed in early February at the temporary SOS space. Wade depo. 140. Marks came to Birmingham around February 10, 1995 to train the Birmingham staff on the computers. Glass depo. 64–65; Wade depo, defendant's ex. 1.

Due to a strained relationship between Kurilec and Wade over the conditions of the Birmingham branch, Wade began reporting directly to Londre in late January or early February. Londre depo. 303; Wade depo. 123. Wade learned from Londre's secretary and later Londre confirmed that a Chemical employee had been in Birmingham in January to locate permanent space and that the search for available permanent space was still ongoing. Wade depo. 147–50; Londre depo. 220. However, at some point after Gorman became Londre's supervisor, all efforts to lease permanent space for the Birmingham branch were put on hold due to Gorman's negative attitude about the Birmingham branch. Londre depo. 254.

Plaintiffs continued to work in the SOS temporary space from December through March of 1995. In March, senior Chemical management decided to close the Birmingham branch, as well as a branch in Raleigh, North Carolina, due to poor performance from a loan production and financial standpoint. Londre depo. 294, 327. Once Londre was informed of the decision, he asked Gorman to reconsider, but his request was denied. Londre depo. 327. On around March 13, 1995 Londre told Wade that Chemical had decided to close the Birmingham office. *Id.* at 327–28. On March 20, 1995 Londre came to Birmingham and told plaintiffs face-to-face that "because of a slow start" the Chemical branch office would be closing. Londre depo. 328–331; Plaintiff's Evid. Sub., Exh. P. Londre again tried to convince Gorman to reconsider and allow the Birmingham branch to remain open by a memo he sent on March 27. Londre depo. 332, ex. 7. However, his request was denied and the Birming-

---

**2.** Marks served as the operations manager for Chemical's Atlanta office and reported to Kuri- lec.

ham branch was closed effective April 30, 1995. Wade depo. 203–206. In the March 27, 1995 memos by Londre and Marks, both recognize the lack of adequate facilities and problems caused by the cramped quarters, lack of organization and inadequate support from management for the Birmingham branch in its temporary space. *See* Plaintiff's Evid. Sub., Exhs. P and Q. On May 1, 1995 all of the plaintiffs, except Perko, began working for Eustis Mortgage Company.

## II. SUMMARY JUDGMENT STANDARD

Defendant has moved for summary judgment in its favor on all claims asserted by plaintiffs. Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick,* 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir.1991) (*en banc* )). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick,* 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick,* 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with addi-

tional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

## III. PLAINTIFFS' CAUSES OF ACTION

### A. *Assertions in the Complaint, As Amended*

Plaintiff commenced this action by filing a complaint on January 8, 1996, alleging that defendants[3] breached the employment contracts entered into with plaintiffs (Count I) and misrepresented and/or suppressed material facts concerning the nature and quality of the Birmingham branch office of Chemical Residential Mortgage Corporation (Counts II and III). On May 7, 1996 plaintiffs filed their first amended complaint, without leave from the court, adding a claim for breach of an agreement with plaintiffs, separate from the employment contract (Count IV), and fraud based on defendant making misrepresentations with no present intent to perform promises made along with assertions of suppression of material facts (Count V—entitled

**3.** In the original complaint plaintiff named as defendants Chemical Residential Mortgage Corporation; Margaretten & Company, Inc.; and Chemical Bank in addition to Chase Manhattan Mortgage Corporation. On August 22, 1996, all named defendants, except Chase Manhattan Mortgage Corporation, were dismissed. The parties are in agreement that due to the merger of Chase Manhattan and Chemical Bank, the proper defendant is Chase Manhattan Mortgage, even though all of the activities in question involved Chemical employees. *See* Plaintiffs' August 22, 1996 motion to dismiss; Plaintiffs' Memorandum in Opposition to Summary Judgment.

**4.** For purposes of this motion only, the court assumes that all of the statements by Kurilec were spoken just as plaintiffs have alleged.

**5.** Plaintiffs' accounts of when the statements were made to them and the substance of the statements made to them vary somewhat. The statements set out in the opinion encapsulate the substance of those presented by plaintiffs in their complaint and brief. The first evidence of any such statements are on October 11, 1994 when plaintiffs Wad and Holle visited Kurilec in Atlanta. Wade depo. 93. Kurilec told Wade and Holle that he was "starting" to look for space in Birmingham, that furniture was in storage "sitting waiting," and that he thought that Chemical

"Fraudulent Misrepresentation"). In the court's December 16, 1997 order, the court denied plaintiff's motion to amend the complaint for a second time and concluded that allegations of fraud relating to (1) claims that the employment offers to plaintiff were represented to be unconditional and (2) the failure to disclose production or profitability requirements were encompassed in the first amended complaint. Defendant has answered plaintiffs' complaint, as amended and denied the allegations of fraud and breach of contract.

### B. *Statements By Kurilec*[4]

Considering the evidence in the light most favorable to plaintiffs as nonmovants, the evidence indicates that Kurilec stated the following during meetings with various plaintiffs in mid-November of 1994:[5]

(1) Chemical **had** an existing plan **to open** a branch office in Birmingham;

(2) Chemical **had been** looking at office space and **would arrange** permanent office space. *See* Fuller depo. at 31; Harrington interrog.

(3) Chemical **had furniture stored** in a warehouse in Atlanta that was ear-

would be ready to open a Birmingham office in a couple of weeks. *Id.* Kurilec made a similar statement about available furniture during a meeting with Wade on November 17 or 18, 1994. *Id.* at 109–11. The statements listed above were apparently made to plaintiffs Wade, Holle, Fuller, Harrington and Perko at the dinner meeting on November 21 or 22, 1994.

Plaintiff Glass testified that Kurilec made statements to her about opening a branch office, computers available at the office, quicker loan processing. *See* Glass depo. at 33–34. The evidence indicates that this occurred after Wade was offered the job on November 17, 1994. *Id.* at 33.

Plaintiff Key testified that she first learned about the opportunity at Chemical in mid-November of 1994 from Wade and shortly thereafter attended a meeting where Kurilec and Marks were present and Kurilec discussed the Birmingham branch. *See* Key depo. at 33–34, 67–72.

Plaintiff Mott testified that Kurilec first talked with her about Chemical's Birmingham office at a meeting held the week after November 18, 1994. *See* Mott depo. 31–35. Plaintiff Warren testified that she first met Kurilec at the meeting in the conference room at Fleet on November 23, 1994. *See* Warren depo. 31, 34–36.

marked or waiting to be put in a place in Birmingham. *See* Fuller depo. at 31; Warren depo. at 35; Perko depo. 114; Holle depo. at 53 (in earlier conversation).

(4) The Birmingham office **would be supplied** with the equipment and supplies necessary to operate a full service mortgage company. *See* Fuller depo. at 31; Holle depo. 68; Warren depo. at 35; Holle interrog.

(5) A national advertising campaign **was in effect** and the national campaign **would be used** to market the Birmingham office. Holle depo. 76; Harrington depo. 47; Fuller interrog; Perko depo. 57.

(6) Chemical **had** more products than Fleet, including, construction perm loans and Farmers' home loans. *See* Fuller depo. at 30–31; Harrington depo. at 44–45; Glass depo. at 45; Warren depo. at 35.

(7) Plaintiffs' compensation **would be** better at Chemical than it had been at Fleet, with higher commissions and excellent benefits. Holle depo. 77.

(8) The time between loan origination and loan closing **would be** faster than at Fleet due to Chemical's use of computerized processing. Perko depo. 78–79; Harrington depo. 46–47; Fuller depo. 44.

(9) The Birmingham branch office of Chemical **would have a** superior pricing strategy on mortgages and would offer lower rates than Fleet or elsewhere in Birmingham.[6] Perko depo. at 53; Holle depo. 72.

### C. *Plaintiffs' Breach of Contract Claims*

■ When defining the breach of contract claims, plaintiffs acknowledge that Alabama is an employment-at-will state and argue they are not asserting a breach of the a contract over the terms of the employment. Yet, Count I of the complaint expressly alleges a breach of the plaintiffs' employment contracts with defendant. Plaintiffs have admitted during their deposition testimony that the offer each received for employment with Chemical was from Wade for an indefinite duration. Fuller depo. 52–54; Harrington depo. 58; Holle depo. 122; Key depo. 32; Mott depo. 84–85; Wade 157–58; Warren 18–20; Glass depo. 50–51; Perko depo. 74–75. Therefore, each plaintiff was an employee-at-will of defendant and plaintiffs have no claim for breach of any employment contract. *See Smith v. Reynolds Metals Co.,* 497 So.2d 93 (Ala.1986). Defendant is due to have summary judgment entered in its favor on the breach of contract claim encompassed in count I of the complaint.

■ Plaintiffs do not wholly abandon their breach of contract claims, in that they assert a breach of pre-employment promises which induced plaintiffs to leave established employment and go to work for Chemical as alleged in Count Four of the Amended Complaint. In order for any such breach of contract to be actionable despite an at-will employment relationship, plaintiffs must show that these pre-employment promises constituted an agreement separate and distinct from the at-will employment relationship. *Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036, 1042 (11th Cir.1992). *cert. denied,* 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336.

In the *Forbus* case, the Eleventh Circuit explained that the employees' fraud claims were not barred by the at-will employment doctrine because their claims were based on an agreement for enhanced severance benefits and not on their underlying at-will employment relationship. 958 F.2d at 1042. Instead, plaintiffs were alleging fraud in connection with entering into a new agreement where plaintiffs received the consideration of greater severance benefits and defendant received consideration in the form of executed releases and waivers. *Id.*

---

**6.** From the deposition testimony, plaintiff Perko appears to admit that Chemical "had fantastic pricing." *See* Perko depo. at 53–54. In the amended complaint plaintiffs allege that the representation was that the branch "would have a superior pricing strategy" but in the brief the plaintiff changed the substance of the representa-tion to one that "branch offices had a superior pricing strategy." *See* First Amended Complaint & Plaintiff's Brief at 7. The deposition testimony identifies the statement as referring to the future and that Birmingham "would have a superior pricing strategy." *See* Perko depo. 53; Holle depo. 72.

■ In this case, plaintiffs have failed to provide any evidence to support a finding that the statements made by Kurilec, above, constituted any agreement separate or distinct from the terms and conditions of their at-will employment arrangement with Chemical. The subject matter of these representations relate only to work conditions that would occur during plaintiffs' employment. There is no indication that plaintiffs were providing any consideration in return for these promises, other than leaving their employment at Fleet to accept employment at Chemical, which was the consideration provided for their at-will employment arrangement. Although these promises may have been made by Kurilec prior to plaintiffs entering into an employment arrangement with Chemical, these promises necessarily defined the conditions of their employment with any breach only occurring during the employment relationship. Undoubtably, none of the plaintiffs would insist that Chemical would be required to provide equipment, supplies, furniture or compensation, other than during their employment with Chemical. Therefore, it is not reasonable to conclude that these pre-employment promises constituted a separate contract. As stated above, any claim for the breach of such promises would be barred by the at-will employment doctrine. Defendant is entitled to summary judgment in its favor on the breach of contract claims embraced in Count IV of the amended complaint.

## C. *Plaintiffs' Fraud Claims*

Between the original and the amended complaint, plaintiffs attempt to assert a variety of fraud claims. Upon review of the complaint it appears that plaintiffs have alleged: (1) promissory fraud (Count V); (2) misrepresentation (Counts II and V) and (3) suppression of material facts (Counts III and V).

■ Plaintiffs rely on the Alabama Supreme Court's decision in *Kidder v. AmSouth Bank,* 639 So.2d 1361 (Ala.1994), as support for its argument that misrepresentations or suppression of material facts concerning working conditions made prior to employment are actionable. In *Kidder* the Alabama Supreme Court recognized that Kidder could maintain an action alleging

fraud in the inducement of her employment based upon alleged misrepresentations as to her working conditions. 639 So.2d at 1363; *see also Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036, 1042 (11th Cir.1992), *cert. denied,* 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336; *see also Shaddix v. United Ins. Co. of America,* 678 So.2d 1097, 1099–1100 (Ala.Civ.App. 1995). Thus, the fact that plaintiffs are at-will employees does not prevent them from maintaining their fraud claims against Chemical.

Defendant argues that plaintiffs' claims of fraud must fail because: (1) a majority of the statements are promises to act in the future and plaintiffs have failed to provide evidence as to the essential elements of promissory fraud; (2) the statements of existing fact were true and (3) most statements were simply opinions or predictions.

### 1. Essential Elements of Promissory Fraud

■ ... The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or abstain from some act in the future ... is when the evidence shows that, at the time ... the promises of future action or abstention were made, the promisor had no intention of carrying out the promises, but rather had a present intent to deceive. *Robinson v. Allstate Insurance Company,* 399 So.2d 288 (Ala.1981). If such intent is not substantiated by the evidence, the fraud claim should not be submitted to the jury. The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made ...

*First Bank of Boaz v. Fielder,* 590 So.2d 893 (Ala.1991).

■ "The elements of fraud are 1) a false representation 2) of an **existing material fact,** 3) that is justifiably relied upon, and 4) damage proximately resulting from the reliance." *St. Clair Fed. Sav. Bank v. Rozelle,* 653 So.2d 986, 988 (Ala.1995). (emphasis added). The required showing of an intent not to perform at the time of the misrepresentation was made and the intent to deceive are in addition to the four elements that must be established in an ordinary misrepre-

sentation case. *Palm Harbor Homes, Inc. v. Crawford,* 689 So.2d 3 (Ala.1997). "[T]he law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future." *National Security Ins. Co. v. Donaldson,* 664 So.2d 871, 876 (Ala.1995).

Statements asserting that a person will be given a particular job or certain working conditions, including compensation and commission scheme at some future time are allegations of promissory fraud because the representation is a promise to take action in the future. *See National Security Ins. Co. v. Donaldson,* 664 So.2d 871, 876 (Ala.1995) (promise that plaintiff would be promoted to vice president following the retirement of the vice president and plaintiff would have permanent employment with National Security); *Johnston v. Green Mountain,* 623 So.2d 1116 (Ala.1993) (Inducement to leave present employment and work for defendant based on a promise as to a compensation and commission scheme); *Armstrong v. Flowers Hospital,* 812 F.Supp. 1183, 1192–93 (M.D.Ala.1993), *aff'd,* 33 F.3d 1308 (11th Cir.1994) (agreement by hospital to purchase her scholarship as a condition of employment).

Plaintiffs affirmatively assert in their brief that they "have never in the past, do not contend now, nor will contend in the future that this is a case of promissory fraud ... There is no contention of promissory fraud ..." *See* Plaintiffs' Brief at p. 2. Therefore, this court will consider any allegations in the complaint asserting a fraud based on no present intent to perform future acts to be abandoned.

Even if such claims had not been abandoned, plaintiffs have failed to present any evidence of an intent by defendant to deceive or an intent not to perform the promises at the time of the November, 1994 meeting. Proof that a defendant failed to perform as promised is insufficient by itself to prove a fraudulent intent. *Pegram v. Hebding,* 667 So.2d 696, 703 (Ala.1995); *Pinyan v. Community Bank,* 644 So.2d 919, 923–24 (Ala.1994). While it is undisputed that many of the asserted promises were never fulfilled, plaintiff has presented no evidence indicating that defendant had no intention of fulfilling

these promises in November of 1994. Rather, plaintiffs acknowledge during their deposition that they believed at the time Kurilec made these statements he was genuinely enthusiastic about his plans for the Birmingham office. Wade depo. 227–29; Fuller depo. 104–06; Harrington depo. 90–91; Holle depo. 132–36; Key depo. 71, 123–24; Mott depo. 83–84; Warren depo. 106–09; Glass depo. 94; Perko depo. 116–17.

The undisputed facts indicate actions which were moving toward fulfilling some, and possibly all, of these promises prior to the change in leadership at Chemical. There is also no proof that these statements were made with the intention of deceiving plaintiffs. Kurilec received the necessary approval and hired Wade as the branch manager for Chemical in Birmingham. *See* Wade depo. 111, 114–15. Chemical paid for temporary office space and made attempts to locate permanent office space. Wade depo. 126, 129–32. Plaintiffs were provided with some telephones and equipment and operated under the name of Chemical when processing mortgages. Morris depo. 22, 30. Later, Marks installed computers in the Birmingham space. Wade depo. 140. Marks went in March of 1995 to Birmingham to train the staff on computers. Glass depo. 64–65. Londre lobbied diligently with Gorman to keep the Birmingham branch open and to provide additional time and resources. *See* Plaintiff's Evid. Sub., Exh. P.

As explained in the quotation above, Alabama law provides that a plaintiff cannot establish a fraud claim based on such statements, unless it is a promissory fraud claim. A claim of misrepresentation and/or suppression require a fact in existence at the time the promise was made. The statements numbered four, seven, eight and nine involve only promise for future action. Additionally, statement number one's promise to open a branch office; statement number two's promise that Chemical would arrange permanent office space; and statement number three's promise that the national campaign would be used to market the Birmingham office are also promises of future action.

Plaintiffs state that "all causes of action based on fraud involve suppression of a material fact **prior** to acceptance by plaintiffs of their employment, and/or misrepresentation

of material existing facts to which the plaintiffs relied to their detriment." *See* Plaintiffs' Brief at p. 2. While this assertion relating to the timing of the representations may be material to the employee-at-will doctrine, it provides no assistance to plaintiffs' attempt to assert a promissory fraud claim and call it by another name to avoid having to prove the additional required elements. The court can find no support for the existence of any type of fraud claim based on a promise of action in the future, other than a claim of promissory fraud which plaintiffs have failed to present sufficient evidence as to the essential elements required to present a promissory fraud claim to a jury. Based on the foregoing, defendant are entitled to summary judgment as to any claims of fraud relating to representations of actions to occur at a future time.

### 2. Statements of Fact Were True

Under Alabama law in order for a statement to provide the basis for a fraud action it must be a false representation of a material, existing fact. *Crowne Investments, Inc. v. Bryant,* 638 So.2d 873, 876 (Ala.1994). Defendant argues that the statements of existing fact purportedly made to the plaintiffs on or around November 21, 1994 were in fact true.

■ As to statement number one, above, defendant asserts that there was a plan in existence in early November of 1994 to open a branch office of Chemical in Birmingham. In a memorandum dated October 14, 1994, Kurilec informed Londre of the opportunities he observed in Birmingham and requested Londre's approval to proceed with opening a branch office and the hiring of Wade as its manager. *See* Plaintiff's Evid. Sub, Exh. O. Londre and Williams approved the plan for a Birmingham office and advised Kurilec to prepare a business plan on the Birmingham branch for presentation to the executive committee. *See* Londre depo. 25, 87, 110.

Kurilec solicited Wade's assistance in gathering information for the business plan. Londre depo. 152; Kurilec depo. 63–64; Wade depo. ex. 3. Around November 7, 1994, Chemical's executive committee approved the plan to create a Birmingham branch office with Wade as its manager. *See* Wade depo. 111. Chemical intended to come to Birmingham and open a branch office. *See* Londre depo. at 59. Londre testified that he believed Chemical was going to open a branch in Birmingham. *Id.* at 145. In December, Wade and several other plaintiffs opened the Chemical Birmingham branch for business and it remained open until April of 1995.[7] The undisputed facts establish the existence of a plan to open a Birmingham branch prior to the meetings where such a statement was made.

The portion of statement number two, above, asserting that Chemical had been looking for permanent space is a factual matter. Wade testified that on at least one occasion, November 18, she and Kurilec met with a leasing agent in Birmingham to look for permanent office space. *See* Wade depo. at 129–30; Kurilec depo. at 130–32. The representations by Kurilec to plaintiff allegedly occurred at dinner on November 21 or 22, 1994. Therefore, plaintiff Wade's own testimony supports a finding that the representation that Chemical had been looking at office space prior to November 22, 1994 was true.[8]

---

**7.** Plaintiffs submitted the affidavit of an expert, John Cox in which Cox states that "for all practical purposes, Chemical never opened a mortgage bank branch in Birmingham, Alabama" based on Chemical's use of temporary office space. *See* Exh. N of Plaintiffs' Evid. Sub. According to Cox, Chemical's presence "was a mortgage business in name only, as the office of Birmingham was of (a) temporary nature." *Id.* The presence of this opinion does not create a genuine dispute as to a material fact in this case. The issue of whether or not Chemical actually opened a branch office in Birmingham was not the subject of the representation at issue, but rather whether Chemical had an existing plan to open such an office. Additionally, the court concludes that based on the undisputed evidence submitted of payments by Chemical of rent on a temporary office space for five months and the payment of salaries for eight employees over various periods during that five months, the record establishes that Chemical opened an office in Birmingham. The judgment as to whether this five month duration constitutes a temporary or permanent branch is not material to the issues before this court on summary judgment.

**8.** After the representation was made, there is evidence of additional efforts to obtain permanent office space. According to the evidence presented, in January, 1995, another Chemical employee, Mike Rampolla, came to Birmingham to look at a potential site for permanent office

As to the existence of furniture that would be used for the Birmingham branch office (statement 3), the underlying factual information is supported as truthful by defendant, with no contrary evidence by plaintiffs. According to Londre, at that time there was furniture in Atlanta ready to be moved. *See* Londre depo. at 116. Plaintiffs have presented no evidence indicating that the furniture referred to was unavailable or committed to another use at that time.

Statement five includes the assertion that Chemical had a national advertising campaign in effect at that time. Defendant have presented evidence that Chemical had national advertising efforts in place. *See* Londre depo. at 462–63. In relation to the Birmingham office, Chemical distributed flyers at the National Builder's Convention in Las Vegas that listed the Birmingham location. *Id.* at 462. Additionally, a full-page advertisement by Chemical for the National Realtors Association provided a 1–800 number for the Birmingham office. *Id.* at 462–63.

In relation to the products referred to in statement six, Chemical presented evidence that it has a Farmers' home loan program, including permanent construction loans. *Id.* at 463–64. Londre testified that these loan products were available in Birmingham, but the program has national underwriting and is implemented through a wholesale practice and by correspondence. *Id.* at 465. Plaintiff Fuller admits that the Farmers' home loan program was available through Chemical at locations other than Birmingham. *See* Fuller depo. at 40, 42–43. Wade testified that Chemical had more products than Fleet, and a lot of different types of products, while Fleet offered mostly standard types of products. *See* Wade depo. at 239–40. Although several plaintiffs assert that these additional products were not available, plaintiffs have presented no proof to support their assertions.

### 3. Statements v. Mere Opinions or Predictions

 Chemical also asserts that plaintiffs' claims of fraud based on misrepresentations must fail because most of the statements at issue were simply opinions or predictions of the future of the Chemical

branch office and not actual facts. Generally a plaintiff's claim of misrepresentation cannot be based on the expression of an opinion or a prediction of the future. "[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act, and therefore, will not support a fraud claim." *McGowan v. Chrysler Corp.,* 631 So.2d 842, 846 (Ala.1993)(quoting *Fincher v. Robinson Bros. Lincoln–Mercury, Inc.,* 583 So.2d 256, 259 (Ala.1991)); *see also Crowne Investments, Inc. v. Bryant,* 638 So.2d 873, 877 (Ala.1994).

> "Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties. The mere form of the representation as one of opinion or fact is not in itself conclusive, and in cases of doubt the question should be left to the jury."

*McGowan v. Chrysler Corp.,* 631 So.2d 842, 846 (Ala.1993) (other citations omitted). Statements by a salesperson that an automobile was a "fine" car, "top-of-the-line" car, "luxury" car and was a "smooth-riding" car have been held to be opinion or puffery rather than existing facts. *Hughes v. Hertz Corp.,* 670 So.2d 882, 885 (Ala.1995); *Mason v. Chrysler Corp.,* 653 So.2d 951 (Ala.1995); *McGowan v. Chrysler Corp.,* 631 So.2d 842 (Ala.1993). Likewise, statements by a real estate broker that a house was "better than other houses in the neighborhood" and her prediction that the plaintiffs would enjoy "years of convenient, trouble-free living" in the house were statements of opinion and would not support a fraud claim. *Cruse v. Coldwell Banker,* 667 So.2d 714, 715 (Ala. 1995).

In this case plaintiffs described Kurilec's statements during the dinner in November as a "sales pitch" or a motivational or recruiting presentation promoting the employment opportunities at Chemical. *See* Harrington

space. *See* Wade depo. at 146–50; Londre depo. 220–22.

depo. at 40; Perko depo. at 45. Harrington testified that he knew exactly what Kurilec was doing because Harrington had been in insurance and had given similar sales talks himself when trying to talk people into coming and selling a product. Harrington depo. at 40.

 While a salesman cannot legally misrepresent actual facts in a presentation, statements that are simply opinions of the product's future performance or job's future opportunities cannot provide the basis for a fraud claim. In this case, Kurilec's statement that Chemical would arrange permanent office space, would provide the necessary equipment and supplies, that plaintiffs' compensation would be better at Chemical than it had been at Fleet, loan processing would be faster, and the Birmingham Chemical office would have a superior pricing strategy by their very subject matter can be nothing other than predictions or opinions as to how Kurilec anticipated the Birmingham office would be operated once it was functional. For example, in the area of compensation, Kurilec could not for a fact state that plaintiffs would receive higher pay because most, if not all, of the plaintiffs' compensation amounts were tied to commissions. The total amount plaintiffs received in compensation would be determined in the future, to some extent, by the number of mortgages processed. The now existent fact that Kurilec's predictions were unfulfilled for whatever reason, does not make these predictions a fact at the time they were rendered. Therefore, Kurilec's prediction that plaintiffs' compensation would be greater was simply a prediction or opinion.

Some recent court decisions indicate that the Alabama courts may be leaning toward recognizing a fraud claim based on an opinion if the plaintiff can establish a promissory fraud claim, with the required showing of intent to deceive and intent not to perform at the time the statement was made. *Crowne Investments v. Bryant*, 638 So.2d 873, 877 (Ala.1994); *Voyager Guaranty Ins. Co. v. Brown*, 631 So.2d 848 (Ala.1993). Even assuming that opinions can provide a claim for fraud, it is clear that a plaintiff must present sufficient evidence of all the elements of promissory fraud to prevent summary judgment, including intent to deceive and intent

not to perform at the time the promise was made. *Id.* As explained above, plaintiffs have failed to present evidence of these required intent elements, thereby entitling defendant to summary judgment as to all of plaintiffs' fraud claims relating to any statements of opinion or predictions.

### 4. Suppression of Material Facts

Plaintiffs allege that defendant defrauded them by suppressing material facts providing conditions of their employment with Chemical. According to plaintiffs, Chemical's decision as to whether to maintain a permanent branch office in Birmingham and thus their continued employment was dependant on: (1) hiring certain individuals and (2) those individuals meeting a minimal level of production "early on in the process." Plaintiffs assert that these conditions were never communicated to them prior to their decision to accept employment with Chemical. Plaintiffs allege that this constitutes fraud by suppression of material facts based upon Chemical's duty to disclose such material facts due to the special circumstances of the case.

 In order for the suppression of a material fact to amount to fraud under *Alabama Code* § 6–5–102, a plaintiff must show: (1) that the defendant had a duty to disclose a material fact based on a confidential relation between the plaintiff and the defendant or because of the particular circumstances of the case; (2) that the defendant concealed or failed to disclose the material fact; (3) that the defendant's concealment or failure to disclose the material fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered actual damages as a proximate result. *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d 3, 12 (Ala.1997); *McGowan v. Chrysler Corp.*, 631 So.2d 842, 846 (Ala.1993). When faced with a properly supported motion for summary judgment on the fraudulent suppression claim, plaintiff must offer substantial evidence as to each of these four elements. *Mason v. Chrysler Corp.*, 653 So.2d 951, 954 (Ala.1995).

Plaintiffs assert that Londre's deposition testimony proves that Chemical's plan to open a branch office in Birmingham was contingent upon certain minimal levels of production "early on in the process" which

was undisclosed to plaintiffs. *See* Plaintiffs' brief at 9 & 18. Defendant argues that this portion of Londre's deposition was misconstrued by plaintiffs. According to defendant, this testimony indicates that the committee's approval of the Birmingham office was based on the condition that Wade open the office by bringing at least two other productive loan officers with her. *See* Defendant's Reply Brief at 6.

The evidence clearly establishes that the business plan approved by Chemical included a joint proposal that a Birmingham branch would be opened and Sandra Wade would be serving as the branch manager. *See* Londre depo. at 172–75, 179–80. Wade's service as branch manager was a condition for the approval of the plan. *Id.* Chemical looked both for an acceptable market and acceptable people to employ in a branch office when deciding on establishing a new branch office. *Id.* However, while the committee approving the business plan at Chemical knew that Wade wanted to hire nine employees from Fleet for the Chemical Birmingham branch, the plan was not contingent on whether or not any particular person came to work for Chemical, other than Wade. *Id.* at 186–88. The plan estimated production figures on the assumption that two loan officers would be employed. *Id.* at 189, 191.

■ While it is undisputed that Chemical's plan to open a Birmingham branch office was conditioned on Wade accepting the job as branch manager, there has been no evidence presented indicating that the opening was dependant on the hiring of anyone else. It is clear from the evidence submitted, that plaintiffs were told that they would not be offered any employment until Wade was hired and no plaintiffs were actually offered jobs until Wade had been hired. *See* Fuller 25; Key 36; Wade 75–154; Kurilec 127. Then Wade was to talk with each of them and she would be and was the person making job offers. *Id.* Based on the fact that plaintiffs knew that the hiring of Wade was a prerequisite to their hiring, any claim for fraudulent suppression based on the opening of the branch office being contingent on Wade's employment fails due to the absence of proof that such a fact was suppressed.

■ According to Londre, Kurilec was authorized to offer Wade a job at a branch office to open in Birmingham assuming that Chemical would have "some . . . minimal level of production early on in the process." *Id.* at 193. However, Londre stated "[t]here wasn't any specific production level or any number of people . . . just a general belief that we needed some level of production." *Id.* at 195–96. According to Londre, once he learned that the Fleet group was coming over to Chemical as a team, there was no need to determine a minimum number of production. *Id.* at 199. Londre surmised that once Chemical learned of the number of loan officers who would accept employment with Chemical, the minimum production level was no longer relevant. *Id.* at 201. Yet, he admitted that when Kurilec offered Wade the job on behalf of Chemical, Chemical wanted some minimum level of loan volume in production. *Id.* at 200. The executive committee was not informed of Londre's idea of a required production minimum, but rather approved the plan based on the target numbers in the budget. *Id.* at 198.

It is undisputed that in order for Chemical to open a Birmingham branch it needed some means of providing a minimal amount of mortgage production initially. Likewise, Chemical required a certain amount of mortgage production in order for the Birmingham branch to be a viable business. Londre testifies that initially he intended to come up with an estimated minimum production number, but was less concerned with defining this specific number once he learned that a number of the loan officers were coming to work for Chemical, which he anticipated would result in the minimal amount of mortgage production without any problem. Based on Londre's testimony, there is no proof that any specific production number or quota was established for the Birmingham office, other than the budget provided to Chemical's executive committee when approving the business plan for the Birmingham office.

The estimated budget for the Birmingham office was approximately 48 million dollars in production for 1995. *Id.* at 205; Exh. 3 to Wade's depo. at 000013 & 000034–36. The projection for January of 1995 was 34 appli-

cations among the six people. *Id.* at 206; Ex. 3. at 000036. Londre described this as "an estimated number" rather than a target number. *Id.* at 207. Londre did not specifically tell Wade about the estimated budget number and did not directly instruct Kurilec to tell Wade about the budget number. *Id.* at 206. Londre explained that Wade's continued employment was contingent on several factors including trends, profitability as well as meeting the estimated production numbers. *Id.* at 208–211.

According to Kurilec, Wade provided him with the production numbers listed in his October 14, 1994 memo. *See* Kurilec depo. at 78 & 90; Exh. 3 to Wade depo. at 000014–000015. Wade explained that she gave Kurilec production numbers for 1991, 1992, 1993 and the year-to-date for 1994. *See* Wade depo. at 98. Wade said Kurilec did not ask for all these years, but she wanted to provide him a more accurate picture since 1994 had been an exceptional year. *Id.* at 98–99. Wade went on to explain that she "did not want (her) volume based off of that year." *Id.* However, Wade testified that she did not give Kurilec the specific information about the goal production in the business plan or state that eighty percent of the current pipeline would be moved. *See* Wade depo. at 208–09. Wade admits that production numbers would be important for anyone in the mortgage business. *Id.* at 99. According to Wade, the goal production was 25 million at the end of 1995. *Id.* at 209. Based on the deposition excepts provided to the court, the genesis of this 25 million figure is unknown.

Kurilec testified that Wade was given a complete copy of the business plan, which included the estimated production numbers, sometime after October 14 and before the Birmingham branch opened in early December, 1994. *See* Kurilec depo. at 78–80. It is not clear from the evidence submitted if Wade disputes receiving a copy of the business plan prior to accepting employment with Chemical or thereafter. Even assuming Wade received a copy of the business plan with the budget numbers included, further analysis would be required to address the other plaintiffs' suppression claim.

According to defendant, plaintiffs had knowledge of minimum production requirements in the mortgage industry based on their prior experience. Defendant argues that its expectation that plaintiffs would produce a minimal amount of business was not suppressed from them because they would have or should have known that such a production standard would be present anywhere. *See* Ceyte depo. at 179–80, 182. According to defendant's expert, James R. Ceyte, most mortgage loan officers earn their living by straight commission off the production of mortgages, other than when a draw is provided to get them started. *Id.* at 182.

Defendant also argues that conditioning continued employment on plaintiffs' meeting Chemical's expectations as to their performance is inherent in the at-will employment relationship and need not be disclosed. Plaintiffs argue that the fact that Chemical expected a level of production "early in the process" was a heightened performance requirement that should have been disclosed to them and if such had been disclosed they would not have accepted employment with Chemical. *See* Exh. J of Plaintiffs' Evid. Sub.

The court agrees with defendant that when hired by a new business venture the idea that this new business must obtain a minimal profitability in order to remain open is inherent in the at-will employment relationship. Plaintiffs have conceded that they were at-will employees, thereby providing them with a job for an indefinite time that is terminable at the will of either Chemical or each plaintiff. *See Allied Supply Co. v. Brown,* 585 So.2d 33, 35 (Ala.1991).

"An at will employee in Alabama can be discharged for any reason, regardless of whether the employer's motive is reasonable, unreasonable, justified, unjustified, indifferent, malicious, or even illegal." *Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036, 1041 (11th Cir.1992), *cert. denied,* 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336. Based on the fact that Chemical could terminate each and every plaintiff for any reason it desired, it is only logical to conclude that Chemical has no legal obligation to inform plaintiffs of any or all grounds that could result in their employment being terminated, including productivity or profitability for a new branch office being below the employer's projections

or expectations after the first few months of operation. As at-will employees, plaintiffs were on notice that they could be terminated at any time for good cause, bad cause, or no cause at all. *Bates v. Jim Walter Resources, Inc.,* 418 So.2d 903, 905 (Ala.1982). Based on the at-will relationship, the court concludes that the fact that plaintiffs could lose their jobs based on the closing of the Birmingham branch office due to low productivity in the first few Months of operation was not suppressed. Defendant is entitled to have summary judgment entered in its favor as to all of plaintiffs' fraudulent suppression claims.

In summary, defendant is entitled to summary judgment on all of plaintiffs' claims. A separate order will be entered.