Donovan WYATT, Plaintiff,

v.

BELLSOUTH, INC., et al., Defendants.

Civil Action No. 96–C–293–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 12, 1998.

G. Griffin Sikes, Jr., Montgomery, AL, David L. Yewell, Kamuf, Yewell, Pace & Condon, Owensboro, KY, for Donovan Wyatt.

Walter R. Byars, Steiner, Crum & Baker, Montgomery, AL, Jeffrey E. Holmes, Lange, Simpson, Robinson & Somerville, Birmingham, AL, for BellSouth, Inc.

Walter R. Byars, Steiner, Crum & Baker, Montgomery, AL, Jeffrey E. Holmes, Lange, Simpson, Robinson & Somerville, Birmingham, AL, Robert E. Thomas, Jr., BellSouth Telecommunications, Inc., Atlanta, GA, Lisa C. Cross, Ogletree, Deakins, Nash, Smoak & Stewart, Birmingham, AL, for Bellsouth Telecommunications, Inc.

### MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

On January 30, 1996, the plaintiff, Donovan Wyatt, filed this action against BellSouth Inc. and BellSouth Telecommunications, Inc. (referred to collectively as BSC) alleging that he was wrongfully discharged (Count I), that his employment contract was breached (Count II), that he was the victim of the tort of outrage (Count III), that he was defamed (Count IV) and that BSC's actions violated the Employment Retirement Income Security Act (ERISA). This cause is currently pending before the court on a motion for summary judgment filed by the defendants on January 6, 1997. The motion was supplemented on January 9, 1997 and an additional evidentiary submission was made on August 22, 1997. The plaintiff filed his brief and evidence in opposition to the motion for summary judgment on September 12, 1997. The defendants then filed a response which contained additional evidence on September 19, 1997.[1]

## II. FACTUAL BACKGROUND [2]

The plaintiff, Donovan Wyatt, was first employed by BellSouth in a craft position in 1962. In 1969, he was promoted to management and enjoyed a successful career. He was frequently rewarded for his performance. Prior to the move to Montgomery which is the genesis of this lawsuit, Wyatt was well thought of and considered to be a top performer. In 1991, the Montgomery district was considered by upper level management in BSC to be a weak operation. According to the deposition testimony of T.L. Cloar, the BSC upper level manager with

---

1. At a recent scheduling conference, the court offered the plaintiff the opportunity to file additional evidence. Counsel for the plaintiff indicated that they did not wish to file any additional submissions.

2. In setting forth this factual background, the court, as it must, views the evidence and all factual inferences arising therefrom in a light most favorable to the non-movant which is the plaintiff.

responsibility for Alabama, the Montgomery operation had serious problems and management felt that they needed to "be addressed with strong leadership and with someone who knew strong fundamental operations procedure."[3] Rick Harder, who was the General Manager for Network Operations for Alabama, consulted Cloar about the Montgomery district. Cloar suggested Wyatt as the person who could handle managing the district. At that time, Jerry Sanders was the vice-president for Network Operations South. He also asked that Wyatt be sent to Montgomery.

Harder discussed the Montgomery situation with Wyatt. At the time of the discussions, Wyatt had a secure job with the company in Birmingham and enjoyed an excellent reputation. During the discussions with Wyatt about a possible move to Montgomery, Harder made it clear that the Montgomery office had serious problems and that Wyatt, if he accepted the job, was expected to solve those problems and make the office productive. Harder and Wyatt both understood that there was a potential for backlash from the employees of the Montgomery office and that there might be repercussions against Wyatt in terms of employee dissatisfaction and unrest.[4] Eventually, as a result of the company's urging, Wyatt agreed to go to Montgomery as the senior manager, a job formally titled Operations Manager.[5] Harder promised Wyatt his support.

In May 1991, Wyatt began his job as Operations Manager in Montgomery. His management evaluation for 1991 indicated that his supervisors were pleased with his performance. In the first quarter of 1992, an anonymous letter was sent to W.M. Ferguson, BSC executive vice president complaining about Wyatt. The letter contained a number of complaints including allegations that Wyatt used profanity and the fondled female employees. Following receipt of the letter, the Human Resources staff conducted an investigation by interviewing a random sample of 15 employees in the Montgomery district. As a result of the investigation, a recommendation was issued to Wyatt that he review the policy regarding overtime, that the use of profanity and the touching of female employees be controlled, that individual commitments be aligned with District objectives and that the transition from a directive to a participative style of management be continued.

On July 14, 1992, a black rose was delivered to the BSC Montgomery office at 39 Adams Avenue. The card accompanying the rose, which was addressed to "Donovan Wyatt and Rick Wood, Manager—Network Operations" read, "In sympathy of Jimmy Cherry, one of our best supervisors and who we all respect." On July 13, Cherry had been suspended for one week for administrative deficiencies.

On March 24, 1993, Ferguson received another anonymous letter from a Montgomery employee. This letter accused Wyatt of inappropriate behavior, including the use of profanity on March 14, 1993 at the Montgomery Installation Maintenance Center(IMC). Members of the security staff interviewed 28 employees who were working in the IMC on the day of the alleged inappropriate behavior. All of the employees interviewed denied any knowledge of any such incident. No action was taken against Wyatt.

In January 1994, Don Pickens assumed the post of General Manager of Network Operations, the position formerly held by Rick Harder. Pickens thus became Wyatt's direct supervisor. Not long after assuming the position, Pickens went to Montgomery for a meeting and had the occasion to meet with many of Wyatt's staff and management people. Pickens made a point of telling the managers under Wyatt that his door was open and that he was available. On February 1, one of the Montgomery managers who worked for Wyatt, Hank Thornton, called and asked to meet with Pickens. A meeting was set up for the next day in Birmingham. At the meeting, Thornton discussed his problems with Wyatt's management style. Pickens asked Thornton if the other managers

---

3. T.L. Cloar Deposition at 25, 26.

4. Harder deposition at 30, 33, 37, 42, 44, 47 and 48.

5. The job would eventually be entitled Senior Director.

felt the way he did and Thornton told Pickens that they would have to speak for themselves. Although the facts differ somewhat between the witnesses as to how the other managers got involved, suffice it to say that all of the other managers except for Travis Barley contacted Pickens almost immediately and complained about Wyatt. Barley was considered to be an employee loyal to Wyatt. After talking with the Montgomery managers, Perkins decided to send Bill Lee and Don Burchfield to Montgomery to interview the managers who had complaints about Wyatt. Lee was the Director of Human Resources and Burchfield worked with him. Ernest Huddleston, the Security Manager in Mobile, was asked to attend by the Executive Director for Security, Mickey Cox.

On February 3, Lee, Burchfield and Huddleston all traveled to a motel in Prattville, Alabama near Montgomery to meet with the managers. At the managers, request, the meeting took place in a group setting. Wyatt was out of town at the time. The meeting began with Lee discussing the prior incidents involving Wyatt. Following Lee's introduction, the managers then aired their grievances about Wyatt, concentrating on what they believed was an intimidating and profane management style. During the meeting, several employees admitted that they had not told the truth during previous investigations of Wyatt's conduct. Following the meeting, Lee and Burchfield returned to Birmingham and told Perkins about the meeting. Based on this discussion, a recommendation to terminate Wyatt was issued. The recommendation was passed up the supervisory line and Wyatt's termination was authorized. Wyatt was not interviewed before the decision was made to terminate him and no review was made of his personnel file. He was not given an opportunity to rebut the charges against him.

On February 4, Perkins and Lee traveled to Montgomery to meet with Wyatt and inform him that he had been terminated. Becky Dunn, the vice-president for Human Resources, asked the Director of Security, Mickey Cox, to accompany Perkins and Lee to Wyatt's office to act as a witness and to recover any keys, identification cards and proprietary materials that Wyatt may have had. Pickens, Lee and Cox met with Wyatt in his office. Pickens informed Wyatt that he was being terminated because serious allegations had been made against him. He refused to divulge to Wyatt the details of the allegations or the names of the persons who had made them. At Cox's request, Wyatt handed over his keys. Cox stayed with Wyatt while he boxed up his personal belongings. After Wyatt was terminated, a decision was made to develop a record of statements from the persons who had participated in the February 3 meeting. The interviews for those statements were taken late in February, 1994.

## III. DISCUSSION

The record contains significant conflicts about Wyatt's abilities as a manager. The evidence in Wyatt's favor shows that he was an extremely capable manager who had been employed by the defendants for over 30 years. He was sent, at the company's insistence, into a hostile work environment to turn around an office which was a disaster. His efforts on the company's behalf resulted in a revolt by disgruntled employees. The disgruntled employees were able to gain the ear of Wyatt's new supervisor and engineer his dismissal from the company. The dismissal was summary and provided no opportunity for Wyatt to challenge the allegations of the disgruntled employees.

The defendants' view of the evidence presents another image of Wyatt. According to the defendants, Wyatt is a despotic and tyrannical manager whose intimidating management style caused conflict with almost all of his employees. In addition, according to the defendants, Wyatt was a profane man who engaged in inappropriate behavior toward women. The problems which he created in his office required his summary dismissal.

Because this action is before the court on a motion for summary judgment, the court cannot resolve the factual conflicts. Accordingly, in resolving this motion, the court will assume that Wyatt's basic factual approach is correct. In the words of his counsel, therefore, the facts are that, "On Friday, February 4, 1994, at 3:00 p.m. in direct contravention of company written policy guidelines and

firmly established actual practice, the outstanding, unblemished thirty-one year, two month, 30 day professional career of Donovan Wyatt was summarily and involuntarily terminated." The question which must be ultimately answered in the resolution of this summary judgment motion is whether the defendants' summary termination violated the law.[6]

## A. STANDARDS GOVERNING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## B. COUNTS I AND II

### (wrongful discharge and breach of employment)

■ In order to resolve this claim, the court must determine whether Wyatt had a contract of permanent employment with the defendants. If he did not, then he was an "at-will" employee. Alabama law makes clear that if "there is no agreement specifying a definite duration of employment services or limiting the defendant's legal right to terminate such employment," the employment is "at will." *White v. Chelsea Indus., Inc.,* 425 So.2d 1090, 1091 (Ala.1983); *see also Clark v. America's First Credit Union,* 585 So.2d 1367, 1369 (Ala.1991). In Alabama, "an employee contract at-will may be terminated by either party with or without cause or justification ... this means a good reason, a wrong reason or no reason." *Hoffman–LaRoche, Inc. v. Campbell,* 512 So.2d 725, 728 (Ala.1987). Employees in Alabama, "bear a heavy burden of proof to establish that an employment relationship is other than 'at-will.' The law considers lifetime or permanent employment contracts to be extraordinary and not lightly to be implied." *Howard v. Wolff Broadcasting Corp.,* 611 So.2d 307, 311 (Ala.1992). In claiming that he had a permanent employment contract with the defendants, the plaintiff makes two primary

---

**6.** The summary judgment motion does not involve the promissory estoppel claim which plaintiff was permitted to amend to the complaint pursuant to order of the court filed January 26, 1998. Nothing in this opinion should be taken as relating to the promissory estoppel claim.

arguments. He contends (1) that his initial employment with the defendants created a lifetime employment contract, and (2) that the Executive Instructions as written and based on the actual practice of the company, constitute an offer for permanent employment. Each argument will be discussed in turn.

### 1. THE INITIAL EMPLOYMENT CONTRACT

█ Wyatt was hired by the company in November 1962 as a craft employee. The person who conducted the initial employment interview was Joan Wigley, who at the time was an Employment Supervisor. In an affidavit, Ms. Wigley testified that she told all new craft employees like Wyatt that she was seeking only to hire permanent lifetime employees. Consequently, she informed the employees that if they were hired, their job would be a permanent job. According to Ms. Wigley, she made those representations in an attempt to compete with other Mobile employers who were offering higher wages. In Ms. Wigley's words

> As I told new craft employees at that time—"You have job security with the telephone company—you have permanent employment until you choose to retire—you will have a job with the telephone company." By the use of this selling point, I was able to hire hundreds of people through the years for the telephone company but usually at a lesser pay scale than other employers in the Mobile, Alabama.

Wyatt argues that the promises made to him when he was hired by Wigley constituted promises of lifetime employment. His argument, however, is fatally undercut by the fact that a union contract, rather than a contract with the defendants, governed his employment as a craft employee. As the second affidavit of Ms. Wigley makes clear, the positions referred to in her first affidavit were craft and not management positions. At the time she was promising lifetime employment, the craft jobs were governed by an agreement between the Communications Workers of America and the telephone company. Regardless of what promises Wigley may have made, the rights and responsibilities which Wyatt held as a craft employee were embodied entirely in the agreement. The court has

reviewed the agreement between the union and the telephone company and finds no language which could reasonably be construed as an offer of permanent lifetime employment. The company lacked the authority to unilaterally change the terms of that agreement. Accordingly, the court finds that Wyatt was not offered a lifetime employment contract when he was hired as a craft employee.

### 2. THE EXECUTIVE INSTRUCTION

Wyatt also contends that the Executive Instructions No. 12, Section 6, which deals with employee discipline, constitutes an offer of permanent employment.

The executive instruction outlines a four step progressive disciplinary procedure to be followed when disciplining an employee. The executive instructions also contain a number of clarifying remarks about the four step process. For example, Section 3.02 of the Executive Instructions states:

> The following paragraphs are intended as a fairly brief statement of general policy regarding the manner in which supervisors of this Company are to administer employee discipline when such action becomes necessary. They should not be considered as a practice or set of rules but as a guide. Each individual case should and must be handled in keeping with the best judgment the responsible supervisor can muster from within and from those with whom he or she consults.

Section 3.06 states:

> This company, as do most companies in this day and time, adheres basically to a four step progressive disciplinary procedure.

Lastly, Section 3.11 states:

> Nothing in the foregoing should be interpreted as indicating the four progressive discipline steps must be rigidly followed in all cases. The number of steps may be increased or decreased depending on the circumstances.

█ The seminal Alabama case concerning the question of when statements akin to Executive Instruction No. 12 may create a contract of permanent employment is *Hoff-*

man–LaRoche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987). Under the law as pronounced in Hoffman, a party asserting that an employee handbook or other document has created a binding promise of future employment must satisfy a three pronged test:

> ... First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second the offer must have been communicated to the employee by the issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer.

Hoffman–LaRoche, 512 So.2d at 735. That test has been rigidly followed in all of the decisions which have followed Hoffman. See Ex Parte Graham, 702 So.2d 1215 (Ala.1997). With regard to the first inquiry, the court finds that the language of the Executive Instruction No. 12 is not specific enough to constitute an offer. The instruction is a "fairly brief statement of general policy" which includes the disclaimer "nothing in the foregoing should be interpreted as indicating that the four progressive disciplinary steps must be rigidly followed in all cases. The number of steps may be increased or decreased depending on the circumstances." Supra. The language of Executive Instruction No. 12 is less specific than the language of the handbook in Hoffman–La Roche or Graham, both decisions of the Alabama Supreme Court finding that the provisions of a handbook created a permanent employment contract. In Hoffman, for example, the employee handbook stated, "Occasionally, an employee may violate a rule of good conduct. In such a case, the disciplinary procedures outlined here are applied." Hoffman, 512 So.2d at 737. (Emphasis added). Further, the handbook went on to state the offenses for which a four step disciplinary process would be used and to state the specific offenses which were too serious for application of the four step process. In Graham, the handbook contained a developed disciplinary process which included written notice of the reasons for termination and layers of review of the decision to terminate. The handbook also stated that the disciplinary process will be used in enforcing agency work rules. (Emphasis added). In addition, the hand-

book confers on every employee the absolute right to a grievance procedure to contest a termination. In accordance with the provisions in the handbook, that process included the right to be represented by counsel and to have hearing during the grievance process which included the right to present the testimony of favorable witnesses and to cross-examine adverse witnesses. Executive Instruction No. 12 contains no such provisions. It is simply not specific enough to be read as an offer of lifetime employment that cannot be compromised by any method other than compliance with the instruction.

The United States District Court for the Northern District of Alabama has likewise concluded that the disciplinary provisions of Executive Instruction No. 12 are not specific enough to constitute an offer of lifetime employment. Brooks v. BellSouth Telecommunications, Inc., No. CV–94–1008–S (N.D.Ala. July 17, 1996). That conclusion was affirmed by the Eleventh Circuit on appeal. Brooks v. BellSouth Telecommunications, Inc. et al., No 96–6826 (11th Cir. April 18, 1997). In addition, the Supreme Court of Alabama has had the occasion to construe another provision of BellSouth's Executive Instructions in light of the Hoffman decision in a case styled Bell v. South Central Bell, 564 So.2d 46 (Ala.1990). In Bell, the court was called on to decide whether the section of the Executive Instructions concerning the treatment of employees suffering from alcoholism was specific enough to constitute an offer rather than a statement of policy. The court concluded that the language of the applicable Executive Instruction provision was merely a general statement of policy and consequently, did not meet the requirements of an offer of employment.

Wyatt has also failed to produce sufficient evidence on the second prong of the Hoffman–La Roche test which requires a showing that the offer was communicated to the employee by the issuance of the handbook or otherwise. The record is absolutely devoid of any evidence about how the language of Executive Instruction No. 12 was communicated to Wyatt. Wyatt testified that he applied the principles of the Executive Instruction No. 12 to his staff. There is no testimony, however, about when he became

aware of the terms of the executive instruction or who informed him that the executive instruction was somehow mandatory. It is clear that the instruction is not part of any employee handbook. Indeed, the employee handbook, entitled "A Personal Responsibility," which Wyatt was provided does not contain any reference to a progressive disciplinary system. That handbook sets forth a code of conduct for employees and states that, "Violations may result in disciplinary action which could include dismissal and/or criminal prosecution." The booklet then includes a disclaimer which the employee is required to sign. The disclaimer states,

> I have carefully read the booklet, *A Personal Responsibility,* and understand its provisions. I further understand that *A Personal Responsibility* is issued for informational purposes and that it is not intended to create, nor does it represent, a contract of employment.

Wyatt signed the disclaimer.

Wyatt's last argument is, apparently, that the *Hoffman–La Roche* analysis is satisfied because the four step disciplinary process was the policy and practice of the company and that the non-specific language of the instruction should be ignored. In all candor, the court has some trouble discerning the exact contours of the argument. For example, there are no case citations which relate to the argument. It appears that Wyatt is arguing that the non-specific language contained in the Executive Instruction is made more specific by the actual practice of the company and that practice controls even though the executive instruction is vague and there is no mention of the instruction or the practice in the employee handbook.

The evidence before the court shows that the four step disciplinary process contained in the instruction was certainly the preferred method for disciplining employees. That is an outcome that the court would expect. Good personnel management would dictate the use of a progressive disciplinary system. However, the plaintiff's evidence does not establish that the four step disciplinary process was rigidly followed in every case regardless of the facts. Indeed, the deposition

testimony referenced by Wyatt shows that the four step-disciplinary process was not always used in cases where there were serious violations. One of the witnesses referenced by Wyatt is Don Burchfield, one of the senior employees in the Human Resources Department. The following colloquy occurred during his deposition:

Q. (Plaintiff's counsel).... Did you follow that progressive set of discipline as you carried out your discipline of employees?

A. Not always.

Q. Is it fair to say that in most cases you did?

A. Generally, yes.

Q. Okay. Can you give me an example of when you did not, sir?

A. It's not unusual. It's not something that happens every day. But it's not unusual for us to have occurrences where we would not follow the four step process. We might terminate an individual, for example, or if the behavior was such that we felt it deserved termination, as opposed to a counseling and warning or a suspension, and we did those over the years and have done them, are doing them and will do them routinely.

Burchfield then went on to explain some of the types of offenses which would warrant the use of a truncated disciplinary process.[7] His testimony was echoed by other employees.[8] Other employees testified that they understood that the progressive discipline system was to be followed faithfully. None, however, testified that the progressive system was to be followed in every case, no matter how serious the offense. Thus, the evidence, viewed in a light most favorable to the plaintiff, shows that the policy regarding Executive Instruction No. 12 was not significantly different than the written word. The Executive Instruction was used as guide and, in practice, the number of steps were increased or decreased depending on the circumstances. The four step disciplinary process was by far and away the preferred method for handling employee problems. However, when the breach of discipline was

---

7. Burchfield deposition at 24–28.

8. Harkness deposition at 22; Harder deposition at 62–63; Lee deposition at 20–21.

serious enough, fewer steps could be used. Assuming that somehow, under Alabama law, a pattern and practice could transform the non-specific Executive Instruction No. 12 into a specific binding offer of permanent employment, the pattern and practice evidence in this case, resolving all conflicts and inferences in favor of Wyatt, does not rise to the required level.

## C. THE OUTRAGE CLAIM (Count III)

■ Wyatt also contends that he is the victim of the tort of outrage. Obviously, the summary dismissal of an over 30 year employee without an opportunity to be heard raises substantial questions of fundamental fairness. The appropriate legal question, however, is whether his summary dismissal fits within the elements of the tort of outrage. The fact that the conduct may be fundamentally unfair does not mean that the conduct constitutes a tort.

■ Under Alabama law:

The tort of outrage requires extreme and outrageous conduct by a person who intentionally or recklessly causes severe emotional distress to another. The plaintiff must produce sufficient evidence to show that the defendant's conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society."

*Mooney v. Henderson and Walton Women's Center–East, Inc.,* 684 So.2d 1340, 1343 (Ala. Civ.App.1996), *citing Wright v. Wright,* 654 So.2d 542, 544 (Ala.1995) (citations omitted). Wyatt's argument is that the circumstances surrounding his summary termination are so egregious as to fit within the above referenced test. Under Wyatt's version of the facts, his termination was unfair, summary and violated all good personnel practices. However, the discharge of an employee rises to the level of the tort of outrage only if the discharge violates public policy. *See Harrell v. Reynolds Metals Co.,* 495 So.2d 1381 (Ala. 1986). For example, the discharge of an employee who refused to engage in a criminal act would arguably fall within that public

policy exception. The plaintiff has presented no evidence which would establish that his discharge violated public policy. Accordingly, the defendants are entitled to summary judgment on Count III.

## D. THE DEFAMATION CLAIM (Count IV)

Wyatt has a defamation claim which is based on two incidents—(1) that two of the management employees under Wyatt lied about him during an investigation, and (2) that "... company management employees specifically prohibited Wyatt from even telephoning remaining company employees—either on or off the job." He was told that the employees were "scared of him..." [9]

■ In order to establish a defamation claim, a plaintiff must establish the existence of (1) a false and defamatory statement concerning him; (2) an unprivileged communication of that statement to a third party; (3) fault amounting to at least negligence on the part of the defendant; and (4) either actionability of the statement irrespective of the special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Publishing Co.,* 544 So.2d 875, 877 (Ala.1989) *citing* Restatement (2d) of Torts § 558 (1977). Where the defamation is alleged to have taken place in the context of an employee termination, additional rules apply:

To establish a prima facie case of defamation, the plaintiff must show that defendant[s] published a false and defamatory statement concerning the plaintiff to a third person. Statements made subject to a qualified [or conditional] privilege are not actionable unless the plaintiff can prove that the defendant acted with malice. . . .

. . . [A] communication may be conditionally privileged if it is one in which the party has an interest, and is made to another having a corresponding interest. More specifically, this Court has held that communications among employees in the course of transacting the company's business and in the proper scope of the em-

---

**9.** Plaintiff's Brief, filed September 12, 1997, in Opposition to Defendants' Motion for Summary

Judgment at 53.

ployee's duties do not constitute a publication.

*Schrimsher v. Liberty National Life Insurance Company,* 655 So.2d 986 (Ala.1995) (*quoting Cantrell v. North River Homes, Inc.,* 628 So.2d 551, 553 (Ala.1993)). The factual scenario presented by the plaintiff in no way meets the elements of a defamation claim. The fact that two employees may have lied about Wyatt during an internal investigation is simply not defamation. Any communications during the internal investigation are properly characterized as communications among employees in the course of transacting the company's business and hence, are privileged. Wyatt's claim that he was told by other employees that they were scared of him also is not defamation. The statement was made to the plaintiff to explain the actions of the company. It plainly was not published to anyone outside of the business. The defendants are entitled to summary judgment on Count IV.

### E. THE ERISA CLAIM (Count V)

Wyatt's last claim is that he was terminated in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140. The ultimate inquiry under this statutory provision is whether the employer had the specific intent to interfere with the employee's ERISA rights. *Clark v. Coats & Clark,* 990 F.2d 1217, 1222 (11th Cir.1993). "The burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and restated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Id.* at 1223. In this case, Wyatt has made no serious attempt to prove an ERISA violation. The court can find no evidence from which it can be found or inferred that one of the reasons for Wyatt's discharge was to interfere with his pension benefits.[10] This case may be the case of the unfair discharge of a faithful employee or the proper termination of a pro-

fane and despotic manager. Whatever it is, it is not an ERISA case. The defendants are also entitled to summary judgment on Count V.

### IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment filed by the defendants on January 6, 1997, as supplemented on January 9 and August 22, 1997, be GRANTED and that Counts I, II, III, IV and V of the plaintiff's complaint be DISMISSED with prejudice. The case will now proceed solely on the plaintiff's promissory estoppel claim.

---

**10.** "A plaintiff is not required to prove that interference with ERISA rights was the sole reason for discharge but must show more than the incidental loss of benefits as a result of a discharge."

*Clark v. Coats & Clark,* 990 F.2d at 1223 (quoting *Seaman v. Arvida Realty Sales,* 985 F.2d 543, 546 (11th Cir.1993)).