**Kristi HALE and Gale Maxey, Plaintiff,**

v.

**VENCOR NURSING CENTERS EAST, LLC, d/b/a Rehabilitation and Healthcare Center of Mobile, Defendant.**

No. CIV.A. 98–0283–BH–C.

United States District Court, S.D. Alabama, Southern Division.

April 19, 1999.

Richard L. Watters (Watters & Associates ), Mobile, AL, for Plaintiff.

Stephen X. Munger and Phillip B. Russell (Jackson, Lewis, Schnitzler & Krupman) Atlanta, Georgia and John R. Nix (Reams, Philips, Brooks, Schell, Gaston & Hudson), Mobile, AL, for Defendant.

## FINDINGS OF FACT; CONCLUSIONS OF LAW AND ORDER

HAND, Senior District Judge.

This action is before the Court on defendant's motion for summary judgment (Doc. 20). In their complaint, plaintiffs Kristi Hale (Hale) and Gale Maxey (Maxey) allege that the defendant, Vencor Nursing Centers East, LLC[1] d/b/a Rehabilitation

---

1. In their initial complaint, plaintiffs identified the defendant as Vencor Hospice, Inc. In their Amended complaint, they identified the defendant as Vencor Health Services, Inc.

According to the defendant, the correct identity of this party is "Vencor Nursing Centers East, LLC." It is therefore ORDERED that the style of this action be amended to reflect

and Healthcare Center of Mobile (Vencor), is liable for breach of contract, fraud in the inducement, negligence, wantonness and defamation based on certain alleged oral promises by Vencor and their terminations on October 7, 1997. Upon consideration of the motion, plaintiffs' response in opposition thereto (Doc. 29), the agreed facts set forth by the parties in their Pretrial Order (Doc. 31), defendant's reply brief for which defendant is hereby **GRANTED** leave to file (*see,* Motion at Doc. 32) despite plaintiffs' objections (Doc. 33), and all other pertinent portions of the record, the Court concludes that defendant's motion for summary judgment is due to be granted. The Court also finds and concludes at the outset that plaintiffs have abandoned their negligence and wantonness claims. It is therefore **ORDERED** that those abandoned claims be and are hereby **DISMISSED** with prejudice.

## FINDINGS OF FACT

Based on the pleadings, agreed facts, deposition and affidavit testimony and all other evidence of record, the Court finds that, with respect to those claims not abandoned by the plaintiffs, the following are the material undisputed facts in this case.

1. Vencor is a national health care company which owns and operates the facility where plaintiffs worked as Physical Therapy Assistants or PTA's. Before they started working full-time for Vencor, plaintiffs worked full-time as PTA's for In-House Rehab, Inc. (In–House Rehab) and they and their families were covered by that company's employee health insurance plans.

2. While still working full-time during the week for In–House Rehab, plaintiffs began, on September 18 and December 9, respectively, to work for Vencor on a "PRN" basis on the weekends. PRN employment is equivalent to on-call or per diem status where the employee has full discretion in determining when to work and is considered neither a full-time nor a part-time employee. As PRN employees, plaintiffs were paid by Vencor on an hourly basis and were required to clock in and out. If plaintiffs forgot to clock in or clock out, or their time cards were not at the clock, they were required as PRN employees to complete a Time Clock Feedback Form.

3. Around May of 1997, plaintiffs were advised by Eric Dekle, a Vencor Manager, about two new full-time PTA positions which had been created for weekend days at the facility. He explained that the positions required three 10–hour days on the weekends. Plaintiffs were interested in these positions and set up a mutually convenient day on which they could meet with Dekle to more thoroughly discuss the positions.

4. In late May of 1997, plaintiffs met with Dekle and Leigh Riley, the facility's Rehabilitation Services Manager at the time, to discuss the new PTA positions. In this initial meeting, Dekle explained the work schedules for the new positions and answered plaintiffs' questions about breaks, the new benefits plan, paid time off for a vacation plaintiffs had already planned, health insurance coverage and sign-on bonuses.

5. Plaintiffs understood from the initial meeting and several follow-up conversations that: their work responsibilities would not change; they would work three ten and one half hour days which would include two paid 15–minute breaks and an unpaid 30–minute lunch break per day; they were required to clock out and back in for the unpaid lunch break; and they could combine their two paid breaks with their unpaid lunch break for a one hour break but were still required to clock out and back in sometime that day for their 30–minute unpaid lunch break. Plaintiffs understood how to clock in and out and how to complete the Time Clock Feedback Form. Hale asserts only that no one ever

the correct identity of the defendant as set forth in the style of this opinion.

mentioned whether or not it was necessary to clock out if she left the facility. Plaintiffs were told they would be allowed paid time off for a previously scheduled vacation to Cancun, Mexico, starting October 13, 1997. Plaintiffs were also told that they would be eligible for health insurance coverage 90 days after they started their new positions and that they would be paid a sign-on bonus.

6. In late May or early June, a week or two following the initial interview, plaintiffs accepted Vencor's new PTA positions. Plaintiffs each admitted that they were not offered employment for any specific period of time. On June 1, 1997, plaintiffs submitted their required 30–day notice to In-House Rehab terminating their full-time employment agreements with that entity.

7. Hale does not dispute that, on June 17, 1997, she read, completed and submitted Vencor's Application for Employment, on the last page of which appeared, immediately above her signature, the following at-will employment disclaimer:

"In consideration of my employment, I agree to conform to the rules, procedures and regulations of [Vencor]. I understand that my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself. I understand that no representative of [Vencor] other than the President or Vice–President ... has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing."

Defendant's Exhibit C.

8. In a letter dated June 30, 1997, Dekle made an offer of employment as a PTA to each of the plaintiffs. Dekle testified that he sent to each of the plaintiffs at her home address this offer letter and a "Therapist Sign-on Agreement." Only Maxey admits receiving her letter and Sign-on Agreement. The offer letters outlined certain terms and conditions of plaintiffs' employment with Vencor and confirmed plaintiffs' acceptance of Vencor's offer. Each letter expressly states that it "is not intended to be a contract of employment." Defendants' Exhibit D; Plaintiffs' Exhibits E and G. Each letter also states that plaintiffs' employment would start on July 5, 1997, and they would report to Amy Tobon, the facility's Physical Therapy Director. Maxey's starting salary was stated to be $35,708.40 annually. Hale's starting salary was stated to be $36,004.80 annually. Each letter also informed plaintiffs that they would be "subject to the policies and procedures set forth in Vencor's Employee Handbook." *Id.* Although the PTA position being offered to the plaintiffs in these letters was erroneously identified as "exempt" in the sentence referring to the "employment date [of] 7/5/97," plaintiffs have proffered no evidence either that the PTA positions were in fact "exempt" or that they believed them to be so before accepting the positions. In point of fact, both plaintiffs admitted that they were always required to clock-in and out, *albeit* they disagree as to exactly when they were to do so. The evidence establishes, however, that "exempt" employees need never clock in or out. The Timekeeping policy at issue applied only to "non-exempt" employees and, as plaintiffs essentially concede, to them. *See,* Defendant's Exhibit K and Plaintiffs' Exhibit J at 21 and 22 (Vencor's Employee Handbook which defines "exempt" employees as "those employees who, under the FLSA, are not entitled to overtime compensation [i.e.] [b]ona fide executive, administrative and professional employees" and identifies those required to "clock in or out at the beginning and end of your shift, for meal times, and when leaving the facility" under its policy for "Timekeeping for Non–Exempt Employees."). *See also,* Hale's Deposition at 38; Maxey's Deposition at 45.

9. In the Sign-on Agreement sent to each plaintiff, Vencor stated that Maxey would receive a sign-on bonus in the gross amount of $2,000.00 and Hale would receive a sign-on bonus in the gross amount

of $2,200.00. Defendant's Exhibit E; Plaintiffs' Exhibits F and H. As stated above, Maxey admits receiving her letter and Sign–On Agreement. Although Hale does not similarly admit receipt of the June 30th letter, she describes Dekle's promise regarding the bonus as follows:

> And that's were [sic] he offered me two thousand two hundred, because according to his calculations, he was trying to make it where I would receive the full amount to pay for COBRA for ninety days.

Hale's Deposition at 25. Plaintiffs have not contended either that Dekle knew the exact amount of the premiums that would be charged for plaintiffs' COBRA benefits which arose from certain obligations of plaintiffs' prior employer or that Vencor was required to know and divulge such information concerning plaintiffs' COBRA insurance. In addition to setting forth the gross amount of the bonuses, the Sign-on Agreements unambiguously stated that, if the plaintiffs left the company before July 5, 1998, either voluntarily or involuntarily, each would be required to repay the entire gross amount of her sign-on bonus. The Sign-on Agreements further required plaintiffs to pay all costs of collection, including but not limited to attorney's fees and court costs, if Vencor had to take legal action to recover the sign-on bonuses. Finally, in addition to declaring that the "Agreement shall be governed by the laws of . . . Kentucky," each Sign-on Agreement expressly stated that it "shall not be construed as a contract of employment and that Therapist is an employee at will of the Company." Defendant's Exhibit E and Plaintiffs' Exhibits F and H at ¶¶ 5 and 6.

10. On July 5, 1997, plaintiffs started their full-time employment with Vencor as weekend PTA's.

11. On July 8 and 12, 1997, respectively, Maxey and Hale each signed a part-time PRN employment agreement with In–House Rehab for up to 20 hours per week at $35.00 per hour. Defendant's Exhibits B and F.

12. On July 8, 1997, Martha Frederickson, the person then in charge of payroll at In–House Rehab, gave Maxey a COBRA Notice for both plaintiffs when Maxey picked up her final paycheck from In–House Rehab. The COBRA Notice advised each of the plaintiffs that the premium for continuing their respective family's health insurance coverage would be $510.49 per month. The Notice further explained that plaintiffs could elect to continue coverage within 60 days after they received the COBRA Notice or their termination date, whichever occurred last. Accordingly, they had until September 8, 1997, to elect COBRA continuation coverage.

13. At that time, Hale and her family had health insurance coverage through both In–House Rehab and her husband's employer. Hale admits that her In–House Rehab policy was merely secondary coverage for any medical expenses not covered by her husband's policy.

14. On July 11, 1997, plaintiffs met with Leigh Riley in her office and signed the aforementioned June 30th offer letters and Sign-on Agreements. In late July 1997, Maxey and Hale received their sign-on bonuses of $1,187.00 and $1,305.70 net, respectively. The sums of $813.00 and $894.00, respectively, had been withheld by Vencor for taxes. Plaintiffs allege that they were told that their sign-on bonuses "would be enough to pay for three months of their COBRA insurance after taxes." Plaintiffs' Response in Opposition (Doc. 29) at unnumbered 2. However, plaintiffs do not deny that they knew at the outset what amount they would be given as bonuses; were ultimately informed by In–House Rehab about the amount of premiums required to provide COBRA insurance coverage; and did not use their sign-on bonuses to purchase the COBRA coverage, choosing instead to use it all for other things.

15. On August 3 and 4, 1997, plaintiffs each read and signed an Acknowledgment and Receipt of Employee Handbook (Ac-

knowledgment) form and received a copy of the Vencor Employee Handbook. *See e.g.,* Defendant's Exhibits J and K; Plaintiffs' Exhibits I and K. The Acknowledgment form provided, in pertinent part:

> I acknowledge receipt of the Vencor, Inc. Employee Handbook. I have carefully read the contents ... and understand that the Handbook describes certain Vencor policies and procedures ... I understand that by accepting this Handbook and acknowledging its receipt, I agree to follow Vencor policies and procedures, including Vencor's Drug–Free Workplace Policy.
>
> . . . . .
>
> I understand that nothing contained in the Handbook, any personnel policy, procedure or document issued by Vencor, or any statement of supervisors or managers, either verbal or written, is intended to create or suggest a contract between Vencor and me for either employment or the provision of any benefit. I acknowledge that I am employed at the will of the Company and that my employment may be terminated by me or the Company at any time, with or without cause and with or without notice. I further agree and understand that no supervisor, manager or representative of Vencor has any authority to enter into an agreement for employment for any specified period of time or to make any agreement contrary to this policy except in a written agreement expressly stating otherwise and signed by me and the President of the Company.

Defendant's Exhibit J; Plaintiffs' Exhibits I and K. The plaintiffs were each notified in this Acknowledgment that their signed receipt "will be kept in your personnel file." *Id.*

16. Plaintiff's "at-will" status of employment was also emphasized in the Vencor Employee Handbook itself: "ALL EMPLOYEES ARE EMPLOYED AT–WILL. EITHER YOU OR THE COMPANY MAY TERMINATE THE EM-PLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT NOTICE, AND WITH OR WITHOUT CAUSE." Defendant's Exhibit K and Plaintiffs' Exhibit J at p. 13.

17. Vencor's Timekeeping for Non-exempt Employees' policy as contained in its Employee Handbook requires that "exact hours worked must always be indicated on a time card" and employees "must check in or out at the beginning and end of [their] shifts, for meal times, and when leaving the facility for personal reasons..." Defendant's Exhibit K and Plaintiffs' Exhibit J at p. 22. The Timekeeping policy expressly warns: "Any falsification of time records will result in immediate discharge." *Id.*

18. On Saturday, October 4, 1997, plaintiffs admit they left the facility for lunch sometime around 10:50 a.m. and returned at approximately 12:00 p.m. *See,* Defendant's Exhibits L, M and N. Plaintiffs did not clock out when they left the facility. When Maxey returned, she completed a Time Clock Feedback Form showing that she was off the clock and out of the facility only between 11:15 a.m. and 11:45 a.m. Hale admits that after she returned she clocked out at 12:15 p.m. and back in at 12:45 p.m.

19. On Tuesday, October 7, 1997, Riley met separately with each of the plaintiffs. During the meeting, the plaintiffs were each informed that they were terminated for their time keeping practices on October 4, 1997. Plaintiffs have admitted that they were never told that they were being terminated for combining their two 15–minute breaks with their 30–minute lunch break. The Notice of Disciplinary Action prepared as to and signed by each of the plaintiffs indicates that they were reported to have left the facility at "approximately 10:30 and returned after 12:00." Defendant's Exhibit L; Plaintiffs' Exhibit L. Consequently, plaintiffs were each charged with taking more than the one hour that would have been allowed by combining their two

15–minute paid breaks with their unpaid 30–minute lunch break.

20. Two other employees were also terminated on October 7, 1997, for leaving the premises without clocking out and for later falsifying their time records regarding their absence. Another employee was disciplined and not terminated because she was an exempt employee and not subject to the Timekeeping Policy.

21. Plaintiffs termination on October 7, 1997, preceded their preplanned vacations set to begin on October 13, 1997. Consequently, plaintiffs were never denied paid time off for their vacations.

22. On October 13, 1997, Vencor sent plaintiffs separate letters reminding them of their obligation to repay the gross amount of their sign-on bonuses as required by their Sign-on Agreements. Plaintiffs received these letters but have never repaid the sign-on bonuses.

23. After leaving Vencor, from late November through December, 1997, Maxey returned to full-time employment with In–House Rehab. Maxey began working eight hours per day and five days per week and only lost the job when In–House Rehab's contract was terminated. Presently, Maxey is a PTA at Montrose Bay in Fairhope, Alabama, for Mariner Health Care, a position she has held since January 19, 1998. She works eight hours per day on weekdays and is paid between $17 and $18 per hour, which would be between $34,000.00 and $36,000.00 annually for regular forty-hour weeks. Maxey has health insurance coverage for she and her family through Mariner. This insurance coverage has to be paid for by Maxey. Maxey is also eligible for over three weeks of paid time off vacation, holidays and sick pay.

24. After leaving Vencor, Hale worked for NovaPro at the Veterans Administration Facility in Bay Minette, Alabama. On December 1, 1997, Hale went to work as a full-time PTA for American Therapy Services where she works from 8:00 a.m. to 4:30 p.m., Mondays through Fridays, and earns $18.00 per hour, which is $36,000.00 annually for a 40–hour week schedule and about the same amount she was making at Vencor for a 30–hour week schedule. Hale also has health insurance coverage through her employer, American Therapy Services.

25. Plaintiffs allege that Vencor breached oral contracts it made with the plaintiffs and fraudulently induced them to leave their previous full-time jobs by unfulfilled promises: (1) to pay sign-on bonuses equal to the cost of three months of COBRA premiums after taxes; (2) to provide paid time off for plaintiffs' preplanned October 13, 1997, vacations; (3) to allow plaintiffs to combine their two 15–minute paid breaks with their unpaid 30–minute lunch break; and (4) to have plaintiffs under its new benefits package that went into effect July 1, 1997, a promise related only to plaintiffs' right to take paid time-off for their aforementioned preplanned vacations.

26. Plaintiffs also assert a defamation claim based on Vencor's allegation that they falsified their time records which was communicated to Shannon Brooks who was Acting Physical Therapy Director and present at the October 7, 1997 meeting of Riley with Maxey. Plaintiffs' not only contend that Brooks "was merely present as a witness and had no authority or reason to be there" but challenge the assertion that she was Acting Physical Therapy Director with a management interest in the situation merely because "she did not sign the termination notices in that capacity." Plaintiffs' Response in Opposition (Doc. 29) at unnumbered p. 12. Plaintiffs assert no other communication as a basis for their claim of defamation.

## CONCLUSIONS OF LAW

 Despite plaintiffs' protestations to the contrary, the evidence establishes that plaintiffs were mere at-will employees of Vencor who could be terminated with or without justification. *See e.g., Bosarge v. Bankers Life Co.,* 541 So.2d 499 (Ala.1989);

*Meeks v. Opp Cotton Mills, Inc.,* 459 So.2d 814 (Ala.1984); *Hinrichs v. Tranquilaire Hospital,* 352 So.2d 1130 (Ala.1977). In order to establish that an employment contract is one other than one terminable at will, plaintiffs must show three elements:

> (1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, *Bates v. Jim Walter Resources, Inc.,* 418 So.2d 903 (Ala.1982); (2) that the hiring agent had authority to bind the principal to a permanent employment contract, *Alabama Mills v. Smith,* 237 Ala. 296, 186 So. 699 (1939); and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered, *United Security Life Ins. Co. v. Gregory,* 281 Ala. 264, 201 So.2d 853 (1967).

*Bosarge,* 541 So.2d at 501 (emphasis added). As applied to the case at bar, plaintiffs have failed to establish any of the three elements set forth above. Plaintiffs have not even alleged that they were offered lifetime or indefinite employment, let alone establish that Dekle would have had authority to make such an offer. Plaintiffs seem content to rely on the assertion that "Dekle ... made several promises to [the plaintiffs] to cause them to change their status with Vencor from part-time employees to full-time employees" and that "[i]n consideration of these promises the Plaintiffs agreed to change their status from part-time to full-time." Plaintiff's Response in Opposition at unnumbered p. 7. Plaintiffs have seriously misconstrued the third element required to support the breach of contract claim they assert in the context of their employment at-will status with Vencor.

As the Eleventh Circuit recognized in *Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036 (11th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992), a case also misinterpreted by the plaintiffs:

> Certainly the Retirees were at will employees before their retirement. **Had Sears fired them, they would have had no cause of action for either breach of contract or fraud as a result of the termination of the employment relationship.** In this case, however, Sears made a new arrangement with the Retirees prior to their termination in which Sears agreed to provide enhanced severance benefits in return for the Retirees' agreement to execute releases and waivers. It is this supplemental contract, offered by Sears and accepted by the Retirees, that the Retirees say they were fraudulently induced to enter and about which they claim misrepresentations were made and facts suppressed. [Footnote omitted] The Retirees employment at will status that existed prior to this supplemental contract is only relevant to explain why the new arrangement was offered and accepted.

958 F.2d at 1042 (emphasis added). As was true in *Forbus,* plaintiffs in the case at bar have no cause of action against Vencor for either breach of contract or fraud as a result of the termination of their employment relationship. The promises they rely on, even if unfulfilled, were in no measure "separate from the services to be rendered [as PTA's of Vencor]" such that the consideration alleged to have been given by the plaintiffs could convert their at-will status into an otherwise enforceable contract of employment. *Cf. Forbus,* 958 F.2d at 1042, and *Bosarge,* 541 So.2d at 501. Similarly, the *Wade v. Chase Manhattan Mortgage Corp.,* 994 F.Supp. 1369 (N.D.Ala. 1997), another case misinterpreted by the plaintiffs, the court recognized the distinction between a separate enforceable contract and an employees' at-will status:

> In this case, plaintiffs have failed to provide any evidence to support a finding that the statements made by Ku rilec...constituted any agreement separate or distinct from the terms and conditions of their at-will employment arrangement with Chemical. The subject matter of these representations relate only to work conditions that would occur during plaintiffs' employment. There is

no indication that plaintiffs were providing any consideration in return for these promises, other than **leaving their employment** at Fleet to accept employment at Chemical, which **was the consideration provided for their at-will employment arrangement.** Although these promises may have been made by Kurilec prior to plaintiffs entering into an employment arrangement with Chemical, these promises necessarily defined the conditions of their employment with any breach only occurring during the employment relationship.... Therefore, it is not reasonable to conclude that these pre-employment promises constituted a separate contract. As stated above, any claim for the breach of such promises would be barred by the at-will employment doctrine.

994 F.Supp. at 1377 (emphasis added), *applying, Forbus,* 958 F.2d at 1042. Again, as applied to the case at bar, plaintiffs' contention that their change in status from part-time to full-time employment with Vencor, or even their change in status from full-time to part-time with In–House Rehab, constituted sufficient consideration to avoid the bar imposed by the applicable at-will doctrine is specious.

■ Nor can plaintiffs rely on an assertion of fraud in the inducement in order to circumvent the at-will employment bar. In *Wade,* a case not only relied upon here by Hale and Maxey but in which the plaintiffs there also relied on *Kidder v. AmSouth Bank,* 639 So.2d 1361, 1363 (Ala.1994)(plaintiff allowed to maintain an action for fraud in the inducement based on alleged misrepresentations as to her working conditions), the court nonetheless recognized:

> The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or abstain from some act in the future ... is when the evidence shows that, at the time ... the promises of future action or abstention were made, the promisor had no intention of carrying out the prom-

ises, but rather had a present intent to deceive. *Robinson v. Allstate Insurance Company,* 399 So.2d 288 (Ala.1981). If such intent is not substantiated by the evidence, the fraud claim should not be submitted to the jury. The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made ... *First Bank of Boaz v. Fielder,* 590 So.2d 893 (Ala.1991).

> "The elements of fraud are 1) a false representation 2) of an existing material fact, 3) that is justifiably relied upon, and 4) damage proximately resulting from the reliance." *St. Clair Fed. Sav. Bank v. Rozelle,* 653 So.2d 986, 988 (Ala. 1995). (emphasis added). The required showing of an intent not to perform at the time of the misrepresentation was made and the intent to deceive are in addition to the four elements that must be established in an ordinary misrepresentation case. *Palm Harbor Homes, Inc. v. Crawford,* 689 So.2d 3 (Ala.1997). "[T]he law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future." *National Security Ins. Co. v. Donaldson,* 664 So.2d 871, 876 (Ala. 1995).

*Wade,* 994 F.Supp. at 1378–79. As was true in *Wade,* plaintiffs in this case have failed to present any evidence of an intent by defendant to deceive or an intent not to perform the promises at any time prior to plaintiffs' acceptance of an offer of full-time employment. In point of fact, plaintiffs have failed to present evidence sufficient to raise a question of fact concerning the existence of a misrepresentation. Plaintiffs received the sign-on bonuses promised to them both verbally and in the letter from Dekle dated June 30, 1997, which was specifically and expressly "ACKNOWLEDGED AND AGREED TO" by each of the plaintiffs. *See,* Defendant's Exhibit D. Although only Maxey admits receiving this letter prior to the date on which plaintiffs signed the acknowledg-

ment, plaintiffs have presented no evidence that the letter, including the designation of the amount of the bonuses, was any different than the promises made by Dekle during their first or any other discussions concerning the PTA positions at issue. The fact that the amount of the bonuses did not match what COBRA insurance premiums might have been charged to the plaintiffs is also irrelevant because neither plaintiff elected to obtain such COBRA insurance. Nor have plaintiffs presented any evidence that they were not allowed to combine their two paid 15–minute breaks with their unpaid 30–minute lunch break. Plaintiffs admit that they were terminated simply for falsifying their time records, although they deny such falsification. Finally, inasmuch as they were terminated for falsifying their time records prior to their October pre-planned vacation to Cancun, Mexico, defendant did not breach any agreement regarding paid time-off for such vacation. Vencor is entitled to summary judgment on plaintiffs' fraud in the inducement claim.

■ As plaintiffs contend, in order to establish a claim for defamation, they must prove (1) a false and defamatory statement concerning them; (2) an unprivileged communication of that statement to a third party; (3) at least fault amounting to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Publishing Co.,* 544 So.2d 875, 877 (Ala.1989)(emphasis added). *See also, Wyatt v. BellSouth, Inc.,* 998 F.Supp. 1303, 1312–13 (M.D.Ala.1998). The statement alleged to be false by the plaintiffs was the statement that they falsified their time records. Plaintiffs contends that they merely did what they were told they could do in connection with their being allowed to combine their two 15–minute paid breaks with their unpaid 30–minute lunch break in order to have a one-hour lunch break. . Plaintiffs ignore the fact that they

were charged with having left the facility at approximately 10:30 and not returning until 12:00. Even accepting plaintiffs' admission that they left the facility "sometime around 10:50 a.m. and returned at approximately 12:00 p.m." and their contention that they were allowed to modify the timekeeping policy to accommodate the combination of breaks they were permitted to take, the evidence of record establishes that plaintiffs took longer than one hour for lunch and their time records failed to reflect the time they actually took. Thus the evidence establishes that they falsified their time records for October 4, 1997.

■ In addition, plaintiffs have failed to establish that the statement about which they complain was communicated to a third party not entitled by any privilege to hear the statement. It is well established, in the context of a defamation claim, that "communications among employees in the course of transacting the company's business and in the proper scope of the employee's duties do not constitute a publication." *Wyatt,* 998 F.Supp. at 1312–13, *citing, Schrimsher v. Liberty National Life Insurance Company,* 655 So.2d 986 (Ala.1995) *(quoting, Cantrell v. North River Homes, Inc.,* 628 So.2d 551, 553 (Ala.1993)). Plaintiffs have submitted no evidence to refute the fact that Shannon Brooks was the Acting Director of Physical Therapy while Amy Tobon, the person to whom plaintiffs were required to report, was on maternity leave. The fact that Brooks did not sign plaintiffs' termination notices is irrelevant as plaintiffs have proffered no evidence that such notices must be signed by the Director of Physical Therapy.

In addition, plaintiffs have submitted no evidence to satisfy the remaining elements of their defamation claim. Vencor is therefore entitled to summary judgment on that claim as well.

■ Finally, Vencor is entitled to summary judgment on its counterclaim. The at-will employment status of the plain-

tiffs has nothing to do with their contractual obligation to repay a bonus predicated on their continued employment for a designated period of time. The requirement of employment for a designated period constituted ample consideration for the payment of the bonus. Plaintiffs' signed the Sign-on Agreements before they received their bonuses. The Sign-on Agreements were valid and enforceable contracts under Kentucky law by which they were governed.[2] Plaintiffs have admittedly breached these Sign-on Agreements by failing to repay the bonuses. Under Kentucky law, plaintiffs cannot avoid liability by alleging duress or undue influence unless they prove that they were deprived of free will and plaintiffs cannot rely solely on the assertion that they were in "severe financial difficulty" or that Vencor threatened to do what it had a legal right to do (i.e., require plaintiffs to sign the Sign-on Agreement as a condition of their at-will employment and the payment of a sign-on bonus). *See e.g., Mock v. Trustees of First Baptist Church of Newport,* 252 Ky. 243, 67 S.W.2d 9 (1934), reiterating the legal principle applicable under Kentucky law:

> "When knowledge of the fact that fraud has been committed in procuring a contract is brought home to him, the party to it thereby aggrieved is put upon his election. The election to repudiate or rescind the contract for the fraud must be made seasonably. Any further pursuit of the benefits accruing to him under the contract constitute his election to abide by the contract and condone the fraud. Such an election is irrevocable, and he may not thereafter again seek to be relieved of the obligations placed upon him by the terms of the contract because of the fraud practiced upon him in procuring him to become a party to it, because, by electing to pursue the benefits accruing to him under the contract, he has elected to abide by it, and thereby he has condoned the fraud."

67 S.W.2d at 10, *quoting, Cox v. Riggins,* 223 Ky. 510, 4 S.W.2d 403, 405 (1928). *See also, Redmon v. McDaniel,* 540 S.W.2d 870, 872 (Ky.1976)("[I]t is not duress to threaten to do what one has a legal right to do, nor is it duress to threaten to take any measure authorized by law and the circumstances of the case."). Plaintiffs in the case at bar clearly accepted their bonuses despite their knowledge that they were required to repay same if they left their employment with Vencor prior to July 5, 1998, and that they were at-will employees who could be terminated with or without cause. Plaintiffs were terminated prior to July 5, 1998, and are therefore obligated to repay the bonuses. Plaintiffs are also obligated to pay to Vencor the costs, including attorney's fees, it incurred in bringing its Counterclaim to recover the sign-on bonuses, as provided in the Sign-on Agreements.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that there exists no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law on both the complaint filed by the plaintiffs and on their counterclaim. Consequently, the Court concludes and it is therefore **ORDERED** that defendant's motion for summary judgment (Doc. 20) is due to be and is hereby **GRANTED**. Accordingly, it is **FURTHER ORDERED** that **JUDGMENT** be entered: (1) in favor of the defendant, Vencor Nursing Centers East, LLC d/b/a Rehabilitation and Healthcare Center of Mobile, and against the plaintiffs, Kristi Hale and Gale Maxey, plaintiffs to have and recover nothing on their complaint; (2) in favor of defendant, Vencor Nursing Centers East, LLC, and against the plaintiff, Kristi Hale, in the amount of $2,200.00 plus costs, including attorney's fees, incurred in connection with the Counterclaim; and (3) in favor of defendant,

---

**2.** *See, Goodwin v. George Fischer Foundry Systems, Inc.,* 769 F.2d 708, 710 (11th Cir.1985)(contracting parties can choose law of any particular state to govern their contractual rights and disputes)

Vencor Nursing Centers East, LLC, and against the plaintiff, Gale Maxey, in the amount of $2,000.00 plus costs, including Vencor's attorney's fees, incurred in connection with the Counterclaim; said judgment to bear interest at the legal rate of 4.732% from the date of this judgment. Costs are taxed against the plaintiffs.